BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Aaron P. Arnzen (SBN 218272)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:     (858) 914-2001
Facsimile:     (858) 914-2002
Email:         fbottini@bottinilaw.com
               aarnzen@bottinilaw.com

*Counsel for Plaintiffs Michael Hirschberger,*
*James Peterson and Mitchell Small*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| MICHAEL HIRSCHBERGER, JAMES PETERSON and MITCHELL SMALL, derivatively on behalf of ADOBE INC., <br><br> Plaintiffs, <br><br> v. <br><br> SHANTANU NARAYEN, CHRISTIANO AMON, CLAUDE ALEXANDRE, ALEXANDRU COSTIN, DANIEL ROSENSWEIG, AMY BANSE, MELANIE BOULDEN, FRANK CALDERONI, LAURA DESMOND, SPENCER NEUMANN, KATHLEEN OBERG, DHEERAJ PANDEY, DAVID RICKS, DANIEL DURN, ANIL CHAKRAVARTHY, and DAVID WADHWANI, <br><br> Defendants, <br><br> and <br><br> ADOBE INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Michael Hirschberger, James Peterson and Mitchell Small ("Plaintiffs"), derivatively on behalf of Adobe Inc. ("Adobe" or the "Company") allege the following based on personal knowledge as to Plaintiffs and Plaintiffs acts and as to all other matters on information and belief based on the investigation of Plaintiffs' counsel, which included, among other things, a review of legal and regulatory filings, press releases, Adobe's online documents, media reports about Adobe and other public statements issued by the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      Plaintiffs bring this shareholder derivative action on behalf of Adobe to remedy wrongdoing committed by certain of the Company's officers and directors. Throughout the relevant period, Defendants caused Adobe to make false and misleading statements about its artificial intelligence ("AI") strategy, characterizing the strategy as a "generational opportunity" to enhance productivity and creativity through responsible, "commercially safe" models natively integrated into its software ecosystem.  The Individual Defendants represented that this generational opportunity would significantly increase revenues and profits.  They also signed or approved unequivocal statements representing that Adobe did not infringe any copyrighted material as part of training its AI software, such as the statement in Adobe's 2024 Proxy Statement that "*We trained our Adobe Firefly creative generative AI family of models only on licensed images from Adobe Stock, openly licensed content, and public domain content where the copyright has expired*."

2.      The Individual Defendants also approved a statement in Adobe's 2025 Proxy Statement which stated:  "*We chose to train the Adobe Firefly family of creative generative AI models on licensed and public domain content to offer customers a commercially safe solution that respects creator rights and doesn't infringe on third-party intellectual property rights*."

3.      Adobe's senior executives made similar unequivocal statements in an effort to reassure customers that Adobe's new AI-trained software did not infringe other's copyrights.  For example, on October 30, 2025, Adobe's global vice president of AI, Defendant Alexandru Costin, said Adobe's new AI features were superior to those of competitors because they were safe for big companies to use at

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

scale without the fear of costly litigation over accidental copyright breaches.[1] Costin further stated:

> "*We know for sure that the output of these programs can be used in a commercially safe manner. They don't contain trademarks, so you can sleep well knowing you haven't infringed upon anyone's intellectual property by mistake*."

4. The Company's directors also all signed annual reports making similar representations. In Adobe's 2025 Annual Report, which was signed by all the Director Defendants, Adobe represented that: "As AI continues to change content creation, our customers, particularly creators and enterprises, increasingly require responsible, secure and human-centered AI solutions. *In developing our Firefly foundation models*, *we responsibly harness our unique data assets* and help our customers amplify the value of their first-party data. *Adobe leverages a rich dataset sourced from licensed content and public domain assets to train our Firefly generative AI models that are commercially safe for our customers*. This approach respects creator rights and builds trust among enterprise customers, enabling them to confidently use AI-generated outputs in production workflows."

5. These statements and others, as detailed herein, were false, as Adobe's AI-development strategy relied upon the unauthorized acquisition and exploitation of copyrighted materials, thereby exposing the Company to enormous legal, financial, and reputational harm as well as hurting revenues. The Defendants' false statements and material omissions concealed the following material facts: (1) Adobe's customers, who had repeatedly told Adobe they only wanted to purchase commercially safe AI products (meaning software products that did not infringe on copyrighted materials), had begun to decrease their purchases of Adobe's software products as news began to emerge suggesting that Adobe's software was not in fact commercially safe, as it had been developed by violating copyrighted materials; and (2) Adobe's AI-development strategy was proving ineffective to curtail decreasing demand for its products.

6. Defendants' false statements and omissions helped maintain the inflation in Adobe's stock during the relevant time period. To maintain such inflation, the Individual Defendants, with full knowledge of Adobe's unlawful copyright infringement and failing AI-development strategy, caused

---

[1] *See* Amelia McGuire, "Adobe Ups the Ante in Canva Battle with 'Copyright-Safe' AI Features," THE AUSTRALIAN FINANCIAL REVIEW, Oct. 30, 2025.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Adobe to repurchase billions of dollars of its own stock at inflated prices. From March 2024 to February 27, 2026, **Adobe repurchased** $**26.89 billion** of its own stock at significantly inflated prices.

7. Adobe develops and markets a broad suite of software and technology products, including digital media applications, document-management tools, creative editing software, and artificial intelligence technologies. Among the Company's AI initiatives is the SlimLM line of small language models ("SLMs"), which are engineered to perform language-processing and document-assistance functions on mobile and lower-resource devices. Unlike large language models ("LLMs"), which typically require extensive computational infrastructure, SlimLM systems are specifically designed for operation on devices such as smartphones, tablets, and laptops. The effectiveness of these models depends entirely upon the quality and legality of the datasets selected and utilized during the training process by Adobe personnel.

8. To train and commercialize generative AI systems, companies must ingest and process vast quantities of text and other data. Because those activities necessarily involve the reproduction, storage, and use of copyrighted works, AI developers are legally required to ensure that training datasets are lawfully sourced and properly licensed. Adobe, however, failed to implement adequate safeguards or compliance protocols to prevent the incorporation of infringing copyrighted material into the datasets used to train its AI products.

9. Adobe's own technical publications and research disclosures reveal that its SlimLM models were pretrained using the "SlimPajama-627B" dataset ("SlimPajama"). SlimPajama was derived from the "RedPajama" dataset, which itself incorporated the infamous "Books3" collection—a repository containing hundreds of thousands of pirated copyrighted books copied and distributed without authorization from their respective rights holders. SlimPajama also drew from "Common Crawl," a dataset long recognized as containing substantial quantities of copyrighted and unauthorized content. Thus, Adobe knowingly utilized datasets contaminated with unlawfully copied material in connection with the training and development of its AI systems.

10. At all relevant times, Defendants knew, or consciously disregarded, that Adobe's AI-development practices created substantial exposure under copyright law. Despite these obvious risks, Defendants failed to halt the misconduct, implement meaningful oversight controls, or ensure legal

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

compliance. Instead, Defendants prioritized rapid AI expansion and competitive advantage over adherence to copyright protections and lawful corporate conduct.

11. Defendants' misconduct did not occur in a vacuum. Prior to the filing of the copyright infringement lawsuits against Adobe, the technology industry had already been inundated with highly publicized litigation accusing AI developers of unlawfully utilizing copyrighted works to train generative AI models. Those actions included: (i) *Kadrey v. Meta Platforms, Inc.*, No. 3:23-cv-3417-VC (N.D. Cal. 2023); (ii) *Concord Music Group Inc. v. Anthropic PBC*, No. 5:24-cv-03811-EKL (N.D. Cal. 2024) ("*Concord I*"); (iii) *Bartz v. Anthropic PBC*, No. 3:24-cv-05417-WHA (N.D. Cal. 2024); (iv) *In re Mosaic LLM Litigation*, No. 3:24-cv-01451-CRB (N.D. Cal. 2024); (v) *James v. Snowflake Inc.*, No. 2:25-cv-00108-BMM (D. Mont. 2025); (vi) *Hendrix v. Apple In*c., No. 3:25-cv-07558-YGR (N.D. Cal. 2025); and (vii) *Tanzer v. Salesforce Inc.*, No. 3:25-cv-08862-CRB (N.D. Cal. 2025). These proceedings constituted unmistakable red flags and warning signs demonstrating the immense risks associated with the unauthorized use of copyrighted datasets in AI training.

12. The consequences of similar misconduct had already proven catastrophic within the AI industry. For example, Anthropic reportedly agreed to pay approximately $1.5 billion to resolve the *Concord I* litigation and subsequently faced additional claims seeking billions more in damages in *Concord Music Group Inc. v. Anthropic PBC,* No. 3:26-cv-00880-RFL (N.D. Cal. 2026) ("*Concord II*"). These developments provided Defendants with direct notice that Adobe faced similar legal and financial exposure if it continued utilizing infringing training data. Defendants nevertheless failed to take corrective action and instead permitted Adobe's unlawful practices to continue.

13. Consistent with these foreseeable risks, copyright holders ultimately initiated litigation against Adobe itself. On December 16, 2025, a lawsuit captioned *Lyon v. Adobe*, *Inc.*, No. 3:25-cv-10732-JSC (N.D. Cal.), was filed asserting claims for violation of the U.S. copyright laws related to Adobe's AI practices. Less than two months later, on February 9, 2026, a second action—*Kleiner v. Adobe, Inc.*, No. 3:26-cv-01218-JSC (N.D. Cal.)—was filed asserting similar allegations. The filing of these lawsuits triggered significant investor concern regarding the Company's legal exposure and governance failures.

14. Defendants' actions have saddled Adobe with extensive damages and ongoing exposure,

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

including the costs associated with defending multiple copyright infringement actions, potential statutory and compensatory damages, reputational injury, loss of goodwill, diminished enterprise value, and increased regulatory and compliance burdens. Adobe additionally faces the prospect of claims from customers who unknowingly relied upon AI products allegedly trained using unlawfully obtained copyrighted works.

15.     The truth finally emerged in a series of announcements by Adobe in 2026 that both its CEO and CFO would resign.  On March 12, 2026, four minutes after the stock market had closed, Adobe provided disappointing guidance to Wall Street and announced that Defendant Narayen would resign as Adobe's CEO, causing Adobe's stock to tank approximately 7.7% in after-market trading and wiping out billions of dollars of market capitalization.  Narayen's unplanned departure was specifically attributed to his failure to develop and implement a viable AI strategy for Adobe, and came in the wake of multiple lawsuits filed in the preceding months for copyright infringement, undermining Adobe's repeated representations to the market and customers that its software products provided a "commercially safe" AI product.

16.     Then, on June 11, 2026, after the market closed, Adobe shocked the market even further by announcing that Defendant Durn, its CFO and another key architect of its AI strategy, had also resigned. The news triggered the steepest drop in Adobe's share price in 15 months, with the stock falling about 5% in after-hours trading.[2]  The next day—on Friday, June 12, 2026, on a day when the overall stock market notched large gains, Adobe's stock tanked over 10% in intraday trading, reaching a low of $196.90 and eventually closing at $204.02, a 6.76% decline from Adobe's closing price of $218.80 the day before, on unusually heavy trading of over 25 million shares.  Adobe's stock is down over 42% in 2026 alone, its lowest level in seven years, as reflected in the following chart:

[The remainder of this page is intentionally left blank.]

---

[2] *See* "Adobe's CFO Departs While Company Also Searches for a New CEO," BLOOMBERG, June 11, 2026.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT



17. By consciously disregarding known legal risks, authorizing or permitting an unlawful business strategy, and failing to implement adequate oversight and compliance controls, Defendants breached their fiduciary duties of loyalty and good faith to Adobe. As a direct result of Defendants' misconduct, the Company has suffered substantial harm and continues to face significant legal, financial, and reputational consequences.

## II. JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under 15 U.S.C. §§ 78j(b) and 78n(a), and SEC regulations 10b-5 and 20A, 14a-9 promulgated thereunder, 17 C.F.R. §§ 240.10b-5 and 240.14a-9. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as to the state law claims alleged, as they arise out of the same transactions and occurrences as the federal claims.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

19. This Court possesses general jurisdiction over each named defendant who is a resident in this District. Additionally, this Court has specific jurisdiction over each named non-resident Defendant because each of the Defendants maintains sufficient minimum contacts in this District to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. At the time of the alleged wrongdoing detailed herein, Adobe was headquartered in this District, each of the Defendants was a director and/or officer of Adobe, and Defendants' conduct was purposefully directed at this District. Exercising jurisdiction over any non-resident Defendant is also reasonable under the circumstances.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 78aa. Adobe is headquartered in this District, one or more of the Defendants either resides in or works in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein in violation of fiduciary duties owed to Adobe occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### III.    DIVISIONAL ASSIGNMENT

21. In compliance with Local Rule 3-5(b), Plaintiffs request that this action be assigned to the San Jose Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of Santa Clara.

### IV.    THE PARTIES

22. Plaintiff Michael Hirschberger is a current stockholder of Adobe and has continuously owned shares of Adobe common stock at all relevant times, and since 2017.

23. Plaintiff James Peterson is a current stockholder of Adobe and has continuously owned shares of Adobe common stock at all relevant times, and since 1987.

24. Plaintiff Mitchell Small is a current stockholder of Adobe and has continuously owned shares of Adobe common stock at all relevant times, and since 2014.

25. Nominal defendant Adobe is a Delaware corporation headquartered in San Jose, California. Adobe common stock trades on the Nasdaq under the ticker symbol "ADBE."

26. Defendant Shantanu Narayen ("Narayen") is Chairman of Adobe's board of directors

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(the "Board") and was CEO from December 2007 to March 12, 2026. Narayen received roughly $51.2 million in compensation for 2025, $52.4 million in compensation for 2024, $44.9 million in compensation for 2023, and $31.6 million in compensation for 2022, all approved by his co-defendants on the Board. Narayen stepped down from his role as CEO on March 12, 2026.

27. Defendant Christiano Amon ("Amon") has been a director of Adobe since 2023. Amon is the President and CEO at Qualcomm Incorporated. Amon received over $389,919 in Board-related compensation for 2025.

28. Defendant Claude Alexandre ("Alexandre") is Adobe's V.P. of Digital Media, B2B Product and Campaign Marketing at Adobe, a position he has held since January 2015.

29. Defendant Alexandru Costin ("Costin") is Adobe's global vice president of AI.

30. Defendant Daniel Rosensweig ("Rosensweig") has been a director of Adobe since 2009. Rosensweig is the Executive Chair of Chegg, Inc. Rosensweig previously served as the President and CEO of RedOctane, an Operating Principal at the Quadrangle Group LLC, the COO of Yahoo!, the President of CNET Networks, and several executive roles at Ziff-Davis and ZDNet. Rosensweig received $384,919 in Board-related compensation for 2025.

31. Defendant Amy Banse ("Banse") has been a director of Adobe since 2012. Banse is a partner at Mosaic General Partnership and previously held several executive roles at Comcast Corporation and Comcast Interactive Media. Banse received over $419,919 in Board-related compensation for 2025.

32. Defendant Melanie Boulden ("Boulden") has been a director of Adobe since 2020. Boulden is the Executive Vice President and Chief Growth Officer to Tyson Foods, Inc., and previously held several executive and management roles at The Coca-Cola Company, Reebok International Ltd., Crayola LLC, Kraft Foods Group Inc., and Henkel Consumer Goods. Boulden received $389,919 in Board-related compensation for 2025.

33. Defendant Frank Calderoni ("Calderoni") has been a director of Adobe since 2012. Calderoni is the CEO of Velocity Global, and previously served executive roles at Anaplan Inc., Cisco Systems, Inc., and SanDisk Corporation. Calderoni received $459,919 in Board-related compensation for 2025.

34. Defendant Laura Desmond ("Desmond") has been a director of Adobe since 2012 and is a member of the Audit Committee. Desmond is the CEO of Smartly.io, the CEO of Eagle Vista Partners, and the Operating Partner in the Media and Technology Practice at Providence Equity Partners LLC. Desmond was previously the CEO of Starcom MediaVest Group. Desmond received $392,955 in Board-related compensation for 2025.

35. Defendant Spencer Neumann ("Neumann") has been a director of Adobe since 2022 and is a member of the Audit Committee. Neumann is the CFO of Netflix, and previously served as the CFO of Activation Blizzard and the Walt Disney Company. Neumann received $394,919 in Board-related compensation for 2025.

36. Defendant Kathleen Oberg ("Oberg") has been a director of Adobe since 2019 and is a member of the Audit Committee. Oberg is the CFO of Marriott International. Oberg received $429,919 in Board-related compensation for 2025.

37. Defendant Dheeraj Pandey ("Pandey") has been a director of Adobe since 2019 and is a member of the Audit Committee. Pandey is the Chair and CEO at DevRev, a software-as-a-service company focused on AI and design to automate software and customer engineering workflows. Pandey previously founded Nutanix, Inc. and served as VP (and Director) of Engineering at Aster Data Systems, Inc. Pandey received $394,919 in Board-related compensation for 2025.

38. Defendant David Ricks ("Ricks") has been a director of Adobe since 2018. Ricks is the President and CEO of Eli Lilly. Ricks received $389,919 in Board-related compensation for 2025.

39. Defendant Daniel Durn ("Durn") is Adobe's CFO and Executive Vice President, Finance, Technology, Security and Operations. Durn drove Adobe's internal generative AI learning and adoption through the AI@Adobe program and also drove Digital Media and Digital Experience growth. Durn received roughly $16.3 million in compensation in 2025, $15.6 million in compensation in 2024, $14.3 million in compensation in 2023, and $13.2 million in compensation in 2022, all approved by the Board.

40. Defendant Anil Chakravarthy ("Chakravarthy") is Adobe's President, Digital Experience Business. Chakravarthy launched the generative AI strategy for Abode Experience Cloud and generative AI first new applications such as Adobe GenStudio for Performance Marketing and AEP AI Assistant.

Chakravarthy received nearly $17.8 million in compensation in 2025, $17 million in compensation in 2024, $15 million in compensation in 2023, and $10 million in compensation for 2022.

41.    Defendant David Wadhwani ("Wadhwani") is Adobe's President, Digital Media Business. Wadhwani delivered Firefly innovations in imaging vector, video (in beta) and design, integrated into products and workflows, and launched Firefly Custom Models, Express on Mobile and Acrobat AI assistant. Wadhwani received nearly $17.8 million in 2025 compensation, $17 million in 2024 compensation, $16.7 million for 2023 compensation, and $11.6 million for 2022 compensation, all approved by the Board.

42.    Defendants Narayen, Amon, Banse, Boulden, Calderoni, Desmond, Neumann, Oberg, Pandey, Ricks, and Rosensweig are collectively referred to herein as the "Director Defendants." Defendants Oberg, Desmond, Neumann, and Pandey are collectively referred to herein as the "Audit Committee Defendants." Defendants Narayen, Durn, Alexandre, Costin, Chakravarthy, and Wadhwani, are collectively referred to herein as the "Officer Defendants." The Director Defendants and the Officer Defendants are collectively referred to herein as the "Defendants."

## V.    DEFENDANTS ACTED IN BAD FAITH AND BREACHED THEIR DUTY OF LOYALTY

43.    Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Adobe, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.    As senior officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act (the "Exchange Act") and traded on the Nasdaq, the Defendants also had a duty to refrain from issuing false and misleading information regarding the Company's business, prospects, and operations.  The Defendants also had a duty to cause the Company to disclose in its regulatory filings with the SEC the omitted facts alleged in this Complaint so that the market price of the Company's common stock would be based upon truthful and accurate information.

45.    At all times relevant hereto, the Defendants were the agents of each other and of Adobe and were at all times acting within the course and scope of such agency.

46. Because of their advisory, executive, managerial, and directorial positions with Adobe, each of the Defendants had access to adverse, non-public information about the Company.

47. Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statement issued by Adobe.

48. Defendants breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to violate copyright laws, federal securities laws, and to cause, or by themselves causing, the Company to make improper statements to the public and failing to implement adequate internal controls over legal and regulatory compliance. These improper practices caused Adobe to incur substantial damages.

49. Defendants, because of their positions of control and authority as officers or directors of Adobe, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. Defendants also failed to prevent the other Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Adobe has expended, and will continue to expend, significant sums of money to remedy Defendants' failures.

## VI.    FACTUAL BACKGROUND

50. Adobe Inc. is a Delaware corporation headquartered in San Jose, California. Adobe is one of the world's largest software companies and develops, markets, and distributes software and cloud-based services used for digital content creation, document management, marketing, analytics, and customer-experience management. The Company's flagship products include Photoshop, Illustrator, Acrobat, InDesign, Premiere Pro, and other applications offered through Adobe Creative Cloud and Document Cloud. Adobe generates billions of dollars in annual revenue from subscriptions and enterprise software services provided to individual consumers, creative professionals, businesses, educational institutions, and governmental entities worldwide. During the Class Period, Adobe increasingly emphasized artificial intelligence as a core component of its growth strategy, investing heavily in the development and commercialization of generative AI technologies, including its Firefly and SlimLM platforms, which the Company integrated into numerous products and services throughout its software ecosystem.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

51. Beginning years before the start of the Relevant Period,[3] Adobe devoted substantial financial and technological resources to expanding its artificial intelligence capabilities in an effort to compete in the rapidly emerging generative AI market. As generative AI technologies became increasingly important to Adobe's future growth strategy, the Company sought to embed AI functionality throughout its software ecosystem and develop proprietary AI models capable of powering both consumer-facing and enterprise-grade products.

52. As part of these efforts, Adobe developed "SlimLM," a family of small language models ("SLMs") designed to perform document-assistance, text-generation, and language-processing functions directly on mobile devices and other resource-constrained hardware. Adobe promoted SlimLM as a highly efficient alternative to larger cloud-based language models, emphasizing its ability to deliver sophisticated AI capabilities while reducing latency, infrastructure costs, and reliance on remote servers.

53. The development of language models such as SlimLM requires the collection, reproduction, storage, and processing of massive amounts of textual data. Through a process commonly referred to as "training," developers expose models to billions of words obtained from books, articles, websites, and other written sources. The model analyzes these materials to identify linguistic structures, contextual relationships, and predictive patterns, which are subsequently encoded into the model's parameters and enable the model to generate human-like responses and perform complex language tasks.

54. Adobe publicly disclosed that SlimLM was pretrained using the "SlimPajama-627B" dataset ("SlimPajama"), a large-scale language-model training corpus assembled and distributed by Cerebras Systems, Inc. Cerebras described SlimPajama as a refined, filtered, and deduplicated derivative of the "RedPajama" dataset developed by Together Computer, Inc. ("TogetherAI").

55. RedPajama was created as an open-source replication of the training corpus reportedly used to develop Meta's LLaMA family of language models. Significantly, RedPajama incorporated the "Books3" dataset, a component of "The Pile," a widely utilized collection of training data used throughout the artificial intelligence industry. Books3 consisted of approximately 196,640 books copied

---

[3] The Relevant Period is January 2023 to the present.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

from Bibliotik, an online shadow-library known for distributing copyrighted literary works without authorization from authors, publishers, or other rights holders.

56. The creators of The Pile openly acknowledged that Books3 was included because long-form books were viewed as particularly valuable for training advanced language models capable of narrative generation, contextual reasoning, and long-sequence comprehension. Thus, the inclusion of copyrighted books was not accidental. Rather, AI developers deliberately incorporated large quantities of literary works into training datasets because those materials materially improved model quality and performance.

57. By the time Adobe adopted SlimPajama as part of its AI-development pipeline, Bibliotik and similar shadow libraries were widely recognized within the technology and publishing industries as repositories containing massive collections of pirated copyrighted content. Such repositories provided AI developers with access to extensive, high-quality training materials without requiring them to bear the substantial costs associated with licensing copyrighted works from their lawful owners.

58. Public reporting further revealed that the individual responsible for assembling Books3 acknowledged that the dataset effectively constituted a comprehensive copy of Bibliotik's book collection. As a result, organizations that downloaded datasets incorporating Books3—including through repositories such as Hugging Face, The Eye, or related distribution channels—necessarily obtained and reproduced unauthorized copies of copyrighted books contained within that collection.

59. The copyright concerns associated with Books3 became increasingly public and well-known throughout the AI industry. By October 2023, portions of the RedPajama project removed Books3 from distribution following widespread allegations that the dataset contained unlawfully copied copyrighted works. RedPajama's own documentation acknowledged that Books3 had become unavailable because of copyright-related concerns. Nevertheless, entities that had previously downloaded RedPajama or derivative datasets, including SlimPajama, had already acquired and incorporated Books3-derived content into their AI-development efforts.

60. SlimPajama also incorporated data obtained from Common Crawl, a massive web-scraping repository containing content collected from millions of websites across the internet. Common Crawl has long been understood to contain substantial amounts of copyrighted material originating from

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

newspapers, magazines, digital publishers, and other content creators. Indeed, in 2023, a Dutch publishing organization publicly demanded that Common Crawl remove millions of copyrighted news articles that had allegedly been copied and incorporated into AI training datasets without authorization.

61.    Accordingly, the datasets underlying SlimPajama contained substantial quantities of copyrighted books, articles, and other creative works obtained without authorization from the corresponding rights holders. Despite these known issues, Adobe utilized SlimPajama to train SlimLM and thereby incorporated data derived from unauthorized copyrighted content into a key component of its artificial intelligence ecosystem.

62.    The legal and financial risks associated with Adobe's AI strategy were particularly significant because Adobe simultaneously sought to distinguish its AI offerings as uniquely safe for commercial use. Beginning in 2023, Adobe publicly represented that enterprise customers using its Firefly generative AI products would receive broad contractual indemnification against copyright infringement claims arising from Firefly-generated content. Adobe assured customers that, if they were sued based on content generated by Firefly, Adobe would bear the resulting legal defense costs and potential liability. As Adobe executive Claude Alexandre publicly stated, "Anything created using Firefly's text-to-image tool will be fully indemnified by the company as a proof point that we stand behind the commercial safety of these features."

63.    Thus, while relying on datasets derived from sources widely associated with unauthorized copyrighted content, Adobe simultaneously promoted its AI initiatives to customers and investors as responsibly developed, legally compliant, and commercially safe. In particular, Adobe heavily marketed "Adobe Firefly"—its flagship suite of generative AI products encompassing image-generation, audio-generation, vector-generation, and video-generation technologies—as a trustworthy platform suitable for enterprise deployment and commercial use.  In SEC filings from fiscal years 2024 and 2025, Adobe repeatedly characterized its artificial intelligence strategy as a "generational opportunity" to enhance productivity and creativity through responsible, "commercially safe" models natively integrated into its software ecosystem.

64.    Adobe told investors that its AI strategy focuses on three pillars: AI Models (proprietary and partner), AI Agents (to automate complex tasks), and Data (leveraging licensed and public domain

assets).

65.    The Individual Defendants also approved public statements and SEC filings that characterized Adobe's AI-development practices as "thoughtful" and "responsible," and publicly represented that Adobe Firefly had been designed to avoid generating infringing content. Adobe further claimed that it did "not mine content from the web" to train Firefly and marketed the platform as commercially safe for users concerned about intellectual-property risks.

## VII.    THE INDIVIDUAL DEFENDANTS CAUSED ADOBE TO MAKE FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN ITS ANNUAL REPORTS, QUARTERLY REPORTS, PROXY STATEMENTS, AND OTHER PUBLIC STATEMENTS

### A.    False and Misleading Statements and Omissions in Adobe's Annual Report for Fiscal Year 2023 and on Its Website

66.    On January 17, 2024, the Individual Defendants caused Adobe to file its Annual Report on Form 10-K with the SEC for the fiscal year ended December 1, 2023 (the "2023 Annual Report")[4]. The 2023 Annual Report was approved and signed by Defendant Durn and by the following Directors: Shantanu Narayen (Chair of the Board of Directors and Chief Executive Officer), Frank Calderoni, Cristiano Amon, Amy Banse, Brett Biggs, Melanie Boulden, Laura Desmond, Spencer Neumann, Kathleen Oberg, Dheeraj Pandey, David Ricks, and Dan Rosensweig.

67.    The 2023 Annual Report contained the following misrepresentations:

| Issue / Topic | Exact Quote from FY 2023 10-K | Page |
|---|---|---|
| **AI Strategy & Mission** | "*We are expanding the capabilities of Creative Cloud on the web with* the launch of Adobe Firefly and Photoshop on the web. We are also infusing AI into our creative apps as a copilot to help our customers and users work faster and smarter, with new models for images and vector graphics, and *AI-powered video features natively integrated into our flagship products like Photoshop, Illustrator*, *and Premiere Pro*." | 3 |
| | "We are also empowering creators *by putting the power of artificial intelligence ('AI') in their hands*, and doing so in ways we believe are responsible." | |
| **Commercially Safe AI** | "With Adobe Firefly, we believe we compete well by *offering generative AI capabilities that are natively integrated into our* | 8 |

---

[4] https://www.adobe.com/cc-shared/assets/investor-relations/pdfs/adbe-2023-annual-report.pdf.

*products and designed to be safe for commercial use.*"

"*We are building our own foundation models* in areas where we have domain expertise and which we believe are most relevant to our customers. *Developing our own foundation models enables us to design Firefly to be commercially safe and in line with our AI Ethics principles of accountability*, *responsibility and transparency*."

| | | |
|---|---|---|
| **Software Implementation** | "*We are also infusing AI into our creative apps as a co-pilot* to help our customers and users work faster and smarter, with new models for images and vector graphics, and *AI-powered video features natively integrated into our flagship products*..." | 8 |
| **Revenue & Growth Drivers** | "*We expect Creative Cloud will drive sustained long-term revenue growth*... *by attracting new users with new features and products like Adobe Express and Adobe Firefly*... and delivering new features and technologies to existing customers... such as *generative AI capabilities*." | 37 |
| **Monetization (Credits)** | "Beginning in late 2023, *we offer subscriptions with Generative Credits for generative AI creation with Firefly*." | 15 |
| **Monetization (Upselling)** | "*Revenue from Digital Media increased*... *driven by*... *migrating our customers to higher valued subscription offerings with increased revenue per subscription*." | 41 |
| **Training Data Rights** | "The content that Adobe Firefly generates is designed to be *commercially safe* because *the Adobe Firefly generative AI model is trained on licensed content, such as Adobe Stock*, *and public domain content for which copyright has expired*." | 11 |
| **Training Data Principles** | "*The Firefly generative AI model is trained on data Adobe has the rights to use*." | 12 |

68.    **Establishing the** "**Safe**" **Brand**: The 2023 Annual Report was Adobe's first annual report to explicitly define its software products as "**commercially safe**." Adobe represented that by training Firefly exclusively on Adobe Stock and public domain content, it avoids the copyright infringement risks associated with other models.

**The** "**Co-pilot**" **Concept**: Adobe characterized its AI implementation as a "**co-pilot**" intended to enhance, rather than replace, human ingenuity. The annual report represented that this includes the native integration of features like **Generative Fill** and **Generative Expand** into Photoshop

to accelerate professional workflows.

**A New Usage Model**: The 2023 filing introduced the concept of **Generative Credits** as a mechanism to monetize high-consumption AI tasks. This marked the transition from a purely ratable subscription model to one that includes consumption-based components for AI.

**Expanding the Audience**: A primary goal of the AI strategy in 2023 was to use "easy-to-use AI capabilities" to attract "**novice content creators**" and "knowledge workers" through products like **Adobe Express**, thereby expanding the company's total addressable market beyond creative professionals.

69.    The Individual Defendants caused Adobe to make other public statements that Firefly was better protected from copyright challenges than its competitors such as OpenAI, Midjourney, and Stability AI because of its purportedly *licensed* training corpus. For example, in 2024 Adobe posted the following statements to its website in an attempt to assuage content creators that Adobe was not infringing their intellectual property and copyrights:

> ***Adobe Firefly models are trained on a dataset of licensed content, such as Adobe Stock, and public domain content where copyright has expired***. Adobe Stock content is covered under a separate license agreement, and Adobe compensates contributors for the use of that content.

> ***We do not mine the web or video hosting sites for content***. *We only train on content where we have rights or permission to do so*.

> ***Many other companies train their generative AI models on content that is collected from the web without permission*** (*often referred to as* "*publicly available online data*"). *We do not believe this is fair toward creators, and this is not our approach*.

> ***We only train Adobe Firefly models on a dataset of public domain content where copyright has expired and licensed content***, such as Adobe Stock, where Adobe compensates contributors for the use of that content.

> ***Adobe focuses on training its models in a way that is responsible and respects the rights of creators***. *We deploy safeguards at each step (prior to training, during generation, at prompt, and during output) to ensure Adobe Firefly models do not create content that infringes copyright or intellectual property rights and that it is safe to use for commercial and educational work*.

> In addition, Adobe provides intellectual property indemnification for enterprise customers for content generated with Adobe Firefly.

70.     For example, an April 22, 2024 article stated that Adobe chief strategy officer Scott Belsky had publicly stated that "A lot of our very big enterprise customers are very concerned about using generative AI without understanding how it was trained.  They don't see it as viable for commercial use in a similar way to using a stock image and making sure that if you're going to use it in a campaign you better have the rights for it — and model releases and everything else. There's that level of scrutiny and concern around the viability for commercial use."[5]

71.     The article also indicated that **Adobe said Firefly was "*only trained on licensed content from Adobe's image banks*."**  To back up that claim, Adobe allegedly "provided enterprise users with full legal indemnification for any content created using it.  **This is '*a proof point that we stand behind the commercial safety and readiness of these features*,' *Claude Alexandre*, *the company's VP of digital media, said at last year's Adobe Summit*.** Unfortunately, or perhaps inevitably, this wasn't entirely true. A Bloomberg report found Firefly was trained, in part, on AI-generated images. Some of these came from Midjourney, an AI many believe was trained on images scraped from the web."

72.      The April 22, 2024 article went on to state: "Adobe said the images from Midjourney only made up 5% of the training material.  That's not a great defense.  The company has 248 million images under license, so that "only" could be up to 1.25 million pictures.  'It doesn't matter if it's 5%, 1%, 000.1%,' said Katie Robbert, CEO and co-founder of Trust Insights, and a MarTech contributor. 'You are making the declarative statements of what your product does and doesn't do. And when it's shown that what you're saying is not true, then you're no longer a trustworthy brand.'"

73.     Adobe's customers were understandably concerned about whether or not Adobe truly possessed all legal rights to the materials it was using.  As the MarTech article noted: "In the event of a lawsuit, it's the brand and not Adobe that's at risk.  'I'm not an IP attorney, but I believe the end user is the one who's liable for the use of the tool,' said Paul Roetzer, CEO of The Marketing AI Institute. 'So if there is some massive class action lawsuit and it's determined that these models were actually illegally trained, the end user is the one that's going to get caught up in it.'"[6]

---

[5] Constantine von Hoffman, "Legal Risks Loom for Firefly Users After Adobe's AI Image Tool Training Exposed," MARTECH, April 22, 2024.
[6] *Id.*

74.     Then, in mid-2024, Adobe faced intense criticism after updating its Terms of Use. Many creators interpreted the revised language as giving Adobe broad rights to access and potentially use customer content for AI purposes. Artists, photographers, designers, and enterprise users expressed concerns that: (1) Adobe might train AI on customer files; (2) confidential client work could be accessed; and (3) copyrighted projects could be incorporated into future AI systems.

75.     In response, in a blog post dated June 10, 2024, Adobe publicly denied that it was training generative AI models on users' content and subsequently revised and clarified its terms. Adobe stated that customer content "will never be used to train any generative AI tool" and emphasized that Firefly was trained on licensed and public-domain material. The post stated:

"At Adobe, there is no ambiguity in our stance, our commitment to our customers, and innovating responsibly in this space. *We've never trained generative AI on customer content, taken ownership of a customer's work, or allowed access to customer content beyond legal requirements*. Nor were we considering any of those practices as part of the recent Terms of Use update. That said, we agree that evolving our Terms of Use to reflect our commitments to our community is the right thing to do."

76.     Adobe's June 10, 2024 blog post went on to state:

**Areas of clarification within our Terms of Use**:

- **You own your content**. Your content is yours and will never be used to train any generative AI tool. We will make it clear in the license grant section that any license granted to Adobe to operate its services will not supersede your ownership rights.

- *We don't train generative AI on customer content*. **We are adding this statement to our Terms of Use to reassure people that is a legal obligation on Adobe**. **Adobe Firefly is only trained on a dataset of licensed content with permission**, **such as Adobe Stock, and public domain content where copyright has expired**.

- **You have a choice to not participate in our product improvement program**. We may use usage data and content characteristics to improve your product experience and develop features like masking and background removal among others through techniques including machine learning (NOT generative AI). You always have the option of opting out of our

desktop product improvement programs.

- **The licenses we require to operate and improve our products on your behalf should be narrowly tailored to the activities needed**. The licenses required to operate our products on your behalf use the standard statutory copyright rights but will now include plain English examples of what they mean and why they are required. We will also separate out and further limit the licenses required to improve our products and emphasize the opt-out option. We will reiterate that, in no case do these license grants transfer ownership of your content to Adobe.

- **Adobe does not scan content stored locally on your computer in any way**. For content that you upload to our servers — like all content-hosting platforms — Adobe automatically scans content you upload to our services to ensure we are not hosting any child sexual abuse material (CSAM). If our automated system flags an issue, we will conduct a human review to investigate. The only other instances where a human will review your content is upon your request (per a support request) if it is posted to a public facing site, or to otherwise comply with the law.

**B.    False Statements in Adobe's Q1 2024 Form 10-Q**

77.    On March 27, 2024, the Individual Defendants caused Adobe to file its Q1 2024 Form 10-Q.  It was signed by Defendant Durn, Adobe's CFO.  In the Quarterly Report, Adobe made the following representations regarding its AI strategy:

| Issue / Topic | Exact Quote from Q1 2024 10-Q | Page |
|---|---|---|
| AI Strategy | "For our first quarter of fiscal 2024, we experienced strong demand across our Digital Media and Digital Experience offerings, driven by our innovative product roadmap. As we execute on our long-term growth initiatives, *with focus on delivering product innovation and driving adoption and usage of our AI-powered solutions, we have continued to experience growth in software-based subscription revenue across our portfolio of offerings*." | 24 |
| Software Implementation | "In September 2023, we released Adobe Firefly, a group of creative generative AI models designed to generate high quality images and text effects. *Adobe Firefly-powered generative AI features are also available across Creative Cloud apps including Adobe Photoshop and Adobe Express*." | 24 |

| Revenue & Growth | "*We expect Creative Cloud will drive sustained long-term revenue growth through a continued expansion of our customer base by attracting new users with new features and products like Adobe Express and Adobe Firefly...*" | 24 |
| AI-Driven Customer Value | "*Creative Cloud delivers value with... frequent product updates and feature enhancements... and AI-powered features natively integrated throughout Adobe Photoshop, Adobe Illustrator and Adobe Premiere Pro.*" | 24 |

78.    The Q1 2024 10-Q made the following key points to investors:

- **Implementation into Software**: The filing identifies Adobe Firefly as a group of creative generative AI models released in September 2023, designed for high-quality images and text effects. ***It highlights the native integration of these models into flagship products like Photoshop and Adobe Express***.[7]

- **Monetization and Growth**: The report attributed current growth in software-based subscription revenue to the "***adoption and usage of our AI-powered solutions***." It specifies that AI is a core driver for attracting "**first-time creators and communicators**" to the platform.[8]

- **Operational Integration**: The report introduces **Adobe GenStudio** (as of that quarter) as a solution combining the "creativity of our Digital Media business with the science of our Digital Experience business" to help customers monetize content through automated AI workflows.[9]

**C.    False Statements in Adobe's Q2 2024 Form 10-Q**

79.    On June 26, 2024, the Individual Defendants caused Adobe to file its Q1 2024 Form 10-Q, for the quarter ending May 31, 2024.  It was signed by Defendant Durn, Adobe's CFO.  The Q2 2024 10-Q focused on the operational expansion of AI capabilities following the initial release of Firefly and the introduction of the Acrobat AI Assistant. In the Quarterly Report, Adobe made the following representations regarding its AI strategy:

---

[7] *Id.* at 24.
[8] *Id.* at 24-25.
[9] *Id.* at 26.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Issue / Topic | Exact Quote from Q2 2024 10-Q | Page |
|---|---|---|
| **AI Strategy** | "*As we execute on our long-term growth initiatives*, *with focus on delivering product innovation and driving adoption and usage of our AI-powered solutions*, *we have continued to experience growth in software-based subscription revenue across our portfolio of offerings*." | 26 |
| **Software Implementation** | "*Adobe Firefly-powered generative AI features are also available across Creative Cloud apps* including Adobe Photoshop and Adobe Express." | 26 |
| **New AI Products** | "In April 2024, **we introduced Acrobat AI Assistant**, **a new generative AI-powered product designed to deliver insights and enhance productivity** through interactive document experiences, which is available as an add-on subscription..." | 26 |
| **Revenue & Growth** | "*We expect Creative Cloud will drive sustained long-term revenue growth* through a continued expansion of our customer base by attracting new users with new features and products like Adobe Express and Adobe Firefly... and delivering new features and technologies to existing customers... such as *generative AI capabilities*." | 26 |
| **Growth Drivers** | "*Revenue from Digital Media increased... driven by increases in revenue associated with our Creative and Document Cloud subscription offerings*... and **migrating our customers to higher valued subscription offerings** with *increased revenue per subscription*." | 31 |
| **Responsible AI** | "While **we have taken a responsible approach to the development and use of AI** in our offerings, there can be no guarantee that future AI regulations will not adversely impact us..." | 39 |

80.    The Q2 2024 Form 10-Q also highlighted the following key aspects of Adobe's AI strategy:

- **Monetization Mechanism**: The filing explicitly linked revenue growth to the "adoption and usage" of AI-powered solutions.  It identifies a specific strategy of migrating customers to "higher valued subscription offerings" as a result of AI integration, which increases the average revenue per subscription.[10]

---

[10] *Id.* at 31 ("Revenue from Digital Media increased $397 million and $818 million during the three and six months ended May 31, 2024 as compared to the three and six months ended June 2, 2023 driven by increases in revenue associated with our Creative and Document Cloud subscription offerings due to continued demand amid an increasingly digital environment, strong engagement across customer

22
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- **Operational Integration**: Adobe highlighted the release of Adobe GenStudio as a cross-cloud solution that combines Digital Media creativity with Digital Experience science to help customers "monetize their content across every channel."  Adobe stated that "Digital Experience revenue was $1.33 billion in the second quarter of fiscal 2024, up from $1.22 billion in the second quarter of fiscal 2023, representing **9% year-over-year growth**. Driving this growth was the increase in subscription revenue, which grew to $1.20 billion in the second quarter of fiscal 2024 from $1.07 billion in the second quarter of fiscal 2023, **representing 13% year-over-year growth**."[11]

**D.    False Statements in Adobe's Q3 2024 Form 10-Q**

81.    On September 25, 2024, the Individual Defendants caused Adobe to file its Q3 2024 Form 10-Q, for the quarter ending May 31, 2024.  It was signed by Defendant Durn, Adobe's CFO.

82.    The Individual Defendants caused Adobe to make the following representations in the Q3 2024 Form 10-Q:

| Issue/Topic | Exact Quote from Q3 2024 10-Q | Page |
|---|---|---|
| **AI Strategy & Innovation** | "As we execute on our long-term growth initiatives, with focus on delivering product innovation and driving adoption and usage of our AI-powered solutions, we have continued to experience growth in software-based subscription revenue across our portfolio of offerings." | 26 |
| **Software Implementation** | "Creative Cloud includes Adobe Express... In September 2023, we released Adobe Firefly... Adobe Firefly-powered generative AI features are also available across Creative Cloud apps including Adobe Photoshop and Adobe Express." | 26 |
| **Acrobat AI Integration** | "In April 2024, we introduced Acrobat AI Assistant, a generative AI-powered product designed to deliver insights and enhance productivity through interactive document experiences, which is available as an add-on subscription..." | 27 |
| **Revenue & Growth Drivers** | "Revenue from Digital Media increased... driven by... strong engagement across customer segments and **migrating our customers to higher valued subscription offerings** with increased revenue per subscription." | 31 |

segments and migrating our customers to higher valued subscription offerings with increased revenue per subscription.").

[11] *Id.* at 28.

23

| Responsible AI Approach | "While **we have taken a responsible approach to the development and use of AI** in our offerings, there can be no guarantee that future AI regulations will not adversely impact us..." | 40 |
|---|---|---|
| Training & Data Rights | "Uncertainty around new and evolving AI use... may require additional investment to develop responsible use frameworks, **develop or license proprietary datasets and machine learning models** and develop new approaches and processes to attribute or compensate content creators..." | 40 |

83.    The Q3 2024 Form 10-Q also highlighted the following key aspects of Adobe's AI strategy:

- **Implementation into Software**: Adobe highlighted the expansion of AI capabilities beyond just "Creative" tasks into "Document" workflows through the Acrobat AI Assistant, which it notes is available as an add-on subscription to increase product value.

- **Revenue and Growth**: The filing explicitly identifies the strategy of using AI to migrate customers to higher-priced tiers, thereby increasing the "revenue per subscription."

- The 10-Q also emphasizes products like Adobe Express and Firefly as entry points for "first-time creators and communicators" to enter the Adobe ecosystem.

- **Safety and Training**: While the 10-K filings are where Adobe explicitly states its models are "trained on data Adobe has the rights to use,"[12] the Q3 10-Q frames this issue through regulatory risk and investment. It acknowledges that the rapid evolution of AI may require the company to "develop or license proprietary datasets" and create new methods to compensate creators, which concealing the material fact that Adobe was already misappropriating creators' content by violating their copyrights without paying them or obtaining licensing rights.

///

///

---

[12] *See, e.g.*, 2024 fiscal year annual report at 12: "Adobe Firefly-generated content is designed to be commercially safe. The Firefly generative AI model is trained on data Adobe has the rights to use. Every asset created using Firefly includes Content Credentials, a digital "nutrition label", to indicate that generative AI was used, bringing more trust and transparency to digital content."

24
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**E.     False Statements in Adobe's 2024 Annual Report**

84.     On January 13, 2025, the Individual Defendants caused Adobe to file its Annual Report on Form 10-K with the SEC for the fiscal year ended November 29, 2024 (the "2024 Annual Report). The 2024 Annual Report was approved and signed by all the Director Defendants, as well as Defendant Durn.  It unequivocally stated that Adobe's software products were "commercially safe" and did not infringe any copyrights or IP law.

85.     Specifically, the 2024 Annual Report explicitly differentiated Adobe's AI products through a commitment to creator rights and brand safety made the following false and misleading representations about the Company's **Copyright and AI Training Practices:**

**Statement 1 regarding Adobe's Training Rights**: The 2024 report states definitively that **"the Firefly generative AI model is trained on data Adobe has the rights to use."**

**Statement 2 regarding the Commercially Safe Design of Adobe's software**: Because of this training approach—leveraging licensed content like Adobe Stock and public domain assets—Adobe represented Firefly as being **"designed to be commercially safe."**  The report also states that **"*Developing our own foundation models enables us to design Firefly to be commercially safe and in line with our AI Ethics principles of accountability*, *responsibility and transparency*.**"  The report also reiterated this fact by stating:  "[W]ith Adobe Firefly, *we believe we compete well by offering generative AI models designed to be safe for commercial use and AI capabilities that are natively integrated into our products*, and with Adobe Express, we believe we compete well by making our creative technologies accessible to a wide audience and enabling easy-to-use, efficient content creation, collaboration and sharing for quick projects."

**Statement 3 regarding IP Indemnification**: The 2024 Annual Report stated that, to build enterprise trust, Adobe offers **intellectual property indemnification** to certain businesses for AI-generated content produced through most Firefly workflows.

**Statement 4 regarding Content Transparency:** The 2024 Annual Report stated that Adobe employs **Content Credentials**—which it calls a digital "nutrition label"—to provide verifiable metadata indicating that generative AI was used to create an asset.

86.    The 2024 Annual Report also represented that Adobe's AI strategy had achieved success in increasing revenues.  Adobe represented its artificial intelligence strategy as a ***core driver of future growth***, centered on the "responsible" deployment of generative AI through its Firefly models. The report emphasized a strategy of natively integrating these capabilities across its software ecosystem to enhance professional workflows.  With respect to "Monetization and Revenue Growth," the Annual Report stated that Adobe views AI as a catalyst for both retaining existing subscribers and attracting new ones, in the process making the following statements:

**Statement 5 regarding Value Enhancement**: Generative AI capabilities are described as increasing the value of existing subscription products, which helps migrate customers to "higher valued subscription offerings" and increases the revenue per subscription.

**Statement 6 regarding Generative Credits**: The 2024 Annual Report represented that Adobe monetizes high-volume AI usage through a system of Generative Credits (tokens). These are bundled into subscriptions, but users can purchase additional credits once their monthly limits are reached.

**Statement 7 regarding New Audience Acquisition**: The 2024 Annual Report represented that by using "easy-to-use AI capabilities" in products like Adobe Express, the company aims to attract "communicators" and "knowledge workers" beyond its traditional base of creative professionals.

87.    The 2024 Annual Report also made the following representations regarding Adobe's AI Strategy and Implementation**.**  Adobe characterized AI as a **"generational opportunity"** that increases the demand for and production of content. The Annual Report stated that the Company's implementation strategy focuses on three areas:

**Creative "Co-pilot":** Adobe emphasized that it was infusing AI into flagship products like Photoshop (Generative Fill/Expand), Illustrator (Generative Recolor), and Premiere Pro (Text-Based Editing) to help users work "faster and smarter".

**New Modalities:** In fiscal 2024, Adobe expanded Firefly with the launch of the Firefly Video Model (public beta) for text-to-video and the Firefly Image 3 Foundation Model.

**Document Intelligence:** The report highlighted the April 2024 introduction of **Acrobat AI**

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Assistant**, which uses generative AI to provide summaries and insights from documents.

88.    The 2024 Annual Report also highlighted Adobe's Enterprise Automation.  For organizations, Adobe introduced Firefly Services for automated content production and Custom Models, which allow enterprises to train models on their own branded assets to maintain consistency.

**F.    False Statements in Adobe's 2025 Annual Report**

89.    On January 15, 2026, the Individual Defendants caused Adobe to file its Annual Report on Form 10-K with the SEC for the fiscal year ended November 28, 2025 (the "2025 Annual Report").

90.    In the Fiscal Year 2025 Annual Report (Form 10-K), Adobe describes its artificial intelligence strategy as a "generational opportunity" to serve a diverse customer universe by assisting and amplifying human ingenuity.  The report outlines a shift toward "agentic" capabilities, where AI does more than just generate content—it automates multi-step actions and decision-making across Adobe's software ecosystem.

91.    The 2025 Annual Report represented that Adobe had achieved a major milestone in August 2025 with the release of Acrobat Studio, which unites Adobe Acrobat and Adobe Express with AI agents to combine productivity and creativity in a single destination.

92.    The 2025 Annual Report Adobe made several specific representations to differentiate its AI as a responsible choice for enterprises. Specifically, with respect to Training Data and Copyright Issues, the 2025 Annual Report made the following false representations:

**Statement 1 regarding Data Rights**: The report explicitly states, "***The Firefly generative AI model is trained on data Adobe has the rights to use***." The Annual Report also stated that Adobe's dataset is sourced from licensed content (such as Adobe Stock) and public domain assets for which the copyright has expired.  The Annual Report also stated that "***Firefly models are commercially safe. They are trained on data Adobe has the rights to use. Every asset generated with Firefly includes Content Credentials, a digital "nutrition label", to indicate that generative AI was used, bringing more trust and transparency to digital content***."[13]

**Statement 2 regarding Commercial Safety**: Because of this training approach, Adobe

---

[13] *See* 2025 Annual Report at p. 8.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

represents that Firefly models are "commercially safe," enabling enterprise customers to use AI-generated outputs in professional production workflows with confidence.  For example, the 2025 Annual Report stated that "***we are harnessing the power of AI across our solutions by bringing together our commercially safe first-party and leading partner AI models best suited for the job***; deploying conversational and agentic capabilities across offerings; ensuring ubiquity on all surfaces; delivering trusted and secure solutions; and expanding our global presence."[14]  The report also stated that "As AI fundamentally transforms content production, distribution and monetization, our solutions accelerate creative expression for creators and creative professionals and enable anyone to create by using the AI functionality infused in our flagship creative applications as well as our AI-first solutions. ***We offer an end-to-end, ideation-to-creation platform powered by our commercially safeFirefly models*** and an expansive partner model ecosystem, offering customers choice and flexibility without the friction of switching between workflows and platforms."[15] The report also distinguished Adobe's "commercially safe products from those of its competitors, stating: "Adobe Models: We build our own creativity-focused, commercially safe Firefly foundation models for generation and editing across categories."[16]

**Statement 3 regarding IP Indemnification**: To further emphasize the allegedly "commercially safe" nature of its AI trained and enabled software products, Adobe emphasized that it offers indemnification protection to its customers, stating:  "with certain of our enterprise and teams solutions, businesses are eligible to obtain an intellectual property indemnification for AI content generated by most Firefly-powered workflows."[17]  The 2025 Annual Report also stated that "we provide indemnifications of varying scope to our customers and channel partners against claims of intellectual property infringement made by third parties arising from the use of our products."[18]

---

[14] *Id.* at p. 2.

[15] *Id.* at 4.

[16] *Id.* at 5.

[17] *Id.* at 8.

[18] *Id.* at 80.

**Statement 4 regarding Transparency (Content Credentials)**: To build trust, every asset created with Firefly includes Content Credentials—a digital "nutrition label" that provides verifiable metadata indicating that generative AI was used.

### G.   False and Misleading Statements in Adobe's 2024 Proxy Statement

93.    On March 1, 2024, Adobe filed its annual Proxy Statement on Schedule 14A with the SEC (the "2024 Proxy Statement"). The 2024 Proxy Statement was approved by each of the Director Defendants and was filed in connection with the 2024 annual stockholder meeting to elect the Director Defendants, vote on executive compensation, and vote on shareholder proposals.

94.    The 2024 Proxy Statement specifically represented that Adobe only trained its AI products on openly licensed content and public domain content:

> ***We trained our Adobe Firefly creative generative AI family of models only on licensed images from Adobe Stock, openly licensed content, and public domain content where the copyright has expired***. Beyond our own model, Adobe is working to enable creators to attach a "Do Not Train" tag to the metadata of their work, leveraging Content Credentials. We are working to drive adoption of an industry standard for this technology to give creators the option to keep their content out of AI training datasets if they choose.[19]

95.    The 2024 Proxy Statement specifically represented that Adobe had developed Firefly to avoid copyright violations:

> We continually enhance the AI ethics processes we built over the past decade to test our models for bias, harm and safety and ***train our models to avoid copyright issues and respect the concerns of our creative customers***. We are driving global solutions and standards through industry-wide efforts such as the Content Authenticity Initiative which we founded in 2019 and technologies like Content Credentials, dedicated to building trust and transparency in digital content.

96.    The 2024 Proxy Statement also represented that Adobe's Firefly was "commercially safe" and helping to generate significant revenue growth:

---

[19] 2024 Proxy at p. 7.

*The launch of the Adobe Firefly family of creative generative AI models and their integrations across Creative Cloud drove tremendous customer excitement with over 4.5 billion generations* since launch, *making Firefly the most popular AI image generation model designed for safe commercial use*.

97.    The 2024 Proxy Statement also stated that the Board of Directors and its committees provide *direct oversight of Adobe's AI strategy* through several governance layers.  The Full Board reviews the Company's overall strategy annually, including the strategy of various business units and key risks identified in the Enterprise Risk Management (ERM) process.  Shareholders were also told that the Board's Governance and Sustainability Committee has primary oversight responsibility for ESG (Environmental, Social, and Governance) matters, which includes receiving *regular updates on AI disclosures*, *risks, and ethics.*

98.    The 2024 Proxy Statement also stated:

*As we harness the power of AI, Adobe is committed to combining technology leadership with responsible innovation. Guided by our principles of accountability, responsibility and transparency, we have implemented a comprehensive AI ethics program that includes training, testing and review by our AI Ethics Committee and Review Board, a cross-functional group of individuals from product, legal, marketing and more*. Adobe's AI-powered tools and *features go through a multi-part review process to help ensure that we are developing AI in an ethical, responsible and inclusive way*.

99.    The 2024 Proxy Statement also stated:

In fiscal year 2023, our teams delivered incredible innovations at an accelerated pace. We built on our decade-plus of AI leadership with a robust, multi-faceted generative AI strategy that focuses on all three layers of the technology stack: data, models and interfaces. *Our rich data sets draw upon our investments across creativity, documents and customer experiences and enable us to train our AI models on high-quality assets which are designed to generate commercially viable, professional quality content*. We are building foundation models in the categories where we have deep domain expertise, including imaging, vector, video, documents and marketing. We are bringing generative

AI to life across our incredible array of industry-leading product interfaces to accelerate ideation, exploration, insights and end-to-end production, delivering magic and productivity gains for a broader set of customers.

**H.     False and Misleading Statements in Adobe's 2025 Proxy Statement**

100.    On February 28, 2025, Adobe filed its annual Proxy Statement on report on Schedule 14A with the SEC (the "2025 Proxy Statement"). The 2025 Proxy Statement was authorized by each of the Director Defendants and was filed in connection with the 2025 stockholder meeting to elect all of the Director Defendants, among other things.

101.    The 2025 Proxy Statement largely repeated the representations from the 2024 Proxy Statement that Adobe's dataset contained exclusively public domain materials: "*We chose to train the Adobe Firefly family of creative generative AI models on licensed and public domain content to offer customers a commercially safe solution that respects creator rights and doesn't infringe on third-party intellectual property rights*." (Emphasis added.)

102.    These statements were materially false and misleading when made because Defendants knew, or were deliberately reckless in not knowing, that Adobe's AI training datasets were not limited to "public domain content where the copyright has expired" and did not exclusively consist of materials that "do[] not infringe on third-party intellectual property rights." At the time these representations were made, Defendants were aware that numerous AI developers had already been sued by copyright holders for training models on datasets containing unlicensed copyrighted works. Defendants also knew, or should have known, that datasets associated with Adobe's AI development efforts—including Books3 and SlimPajama—had been the subject of widespread public scrutiny and copyright-related allegations arising from their inclusion of copyrighted materials without authorization. At a minimum, the Director Defendants acted negligently in making or approving these representations without adequately investigating the provenance and legal status of the datasets upon which Adobe's AI models were trained.

**I.     False Statements Made by Defendant Costin**

103.    On October 30, 2025, Adobe's global vice president of AI, Alexandru Costin, said Adobe's new AI features were superior to those of competitors because they were safe for big companies

to use at scale without the fear of costly litigation over accidental copyright breaches.[20]  Costin further stated:

> "*We know for sure that the output of these programs can be used in a commercially safe manner. They don't contain trademarks, so you can sleep well knowing you haven't infringed upon anyone's intellectual property by mistake*," Costin said.[21]

104.    Adobe's 2026 Proxy Statement also highlighted the fact that 8 out of 11 directors at Adobe possess specific "AI Experience," which the Company considers an essential attribute for navigating the current technology landscape.

### J.    False Statements in Adobe's 2026 Proxy Statement

105.    On February 27, 2026, Adobe filed its annual Proxy Statement on report on Schedule 14A with the SEC (the "2026 Proxy Statement"). The 2026 Proxy Statement, again authorized by each of the Director Defendants, *conspicuously omitted the representations made in the 2024 Proxy Statement and the 2025 Proxy Statement* that the dataset used to train the Company's AI products "openly licensed… public domain content where the copyright has expired" and "doesn't infringe on third-party intellectual property rights."

106.    The Director Defendants' effective retraction of their prior representations regarding dataset used to develop SlimLM represents an implicit admission that that dataset was not free from copyrighted materials at the time the 2024 and 2025 Proxy Statements were disseminated.  However, the 2026 Proxy Statement did not disclose that this was the case and thus concealed material information.

107.    The 2026 Proxy Statement also represented that the Board had direct oversight responsibility for Adobe's AI strategy:

> *The Board maintains direct oversight of and receives regular updates from management on AI, including our strategy, risks, development and governance and ethical innovation approaches*.[22]

---

[20] *See* Amelia McGuire, "Adobe Ups the Ante in Canva Battle with 'Copyright-Safe' AI Features," THE AUSTRALIAN FINANCIAL REVIEW, Oct. 30, 2025.

[21] *Id.*

[22] *See* 2026 Proxy at p. 8.

108.    In fact, in at least two places the 2026 Proxy Statement reiterated the fact that the Board received ***regular briefing from management about the Company's AI strategy***, underscoring the fact that the Board knew all the material facts about Adobe's AI strategy:

> ***Our management team also provides regular updates to the Board and its committees on topics including*** those related to risk management, cybersecurity, regulatory updates and various environmental, social and governance ("ESG") matters including climate actions, ***AI ethics and responsible innovation***, and ESG disclosures and performance objectives.[23]

109.    The 2026 Proxy Statement noted that the Executive Compensation Committee explicitly linked Defendant Narayen's 2025 compensation to his performance in leading Adobe through the "AI era."

**K.    Reasons Why Defendants' Statements Were False and Misleading**

110.    Defendants repeatedly assured investors that Adobe's AI products were "commercially safe," "designed to be safe for commercial use," and trained only on "licensed content" and "data Adobe has the rights to use." These representations were materially false and misleading because Adobe's Firefly generative AI model was trained, at least in part, using the SlimLM dataset, which contained pirated copyrighted works for which Adobe did not possess the rights it claimed to have. Defendants knew, or were deliberately reckless in not knowing, that these statements were false. At the time the statements were made, Defendants were aware that multiple companies had already been sued for copyright infringement based on their use of copyrighted materials in AI training datasets and that the Books3 dataset—a widely used source of copyrighted books for AI training—had become the subject of extensive copyright litigation and was effectively abandoned due to the legal risks associated with its use. Notwithstanding these known risks and circumstances, Defendants continued to assure investors that Adobe's AI products were trained only on content for which Adobe possessed legal rights and were safe for commercial infringement, when the truth was that Adobe's products had been trained on the pirated works.

111.    Specifically, Adobe's AI software and tools, including SlimLM, were trained using data

---

[23] *See* 2026 Proxy at p. 4.

derived from sources widely known to contain unauthorized copyrighted works. While publicly touting its commitment to ethical and responsible AI development, Adobe failed to disclose that SlimLM relied on training data sourced from SlimPajama, RedPajama, Books3, and other datasets containing copyrighted material for which the necessary rights, licenses, or permissions had not been obtained.

112.    The Individual Defendants' knowledge of these facts is further evidenced by Adobe's publication entitled "SlimLM: An Efficient Small Language Model for On-Device Document Assistance," authored by Adobe researchers and academic collaborators. In that publication, Adobe expressly acknowledged that SlimLM was pretrained using the SlimPajama-627B dataset and further disclosed that the model was developed and trained using both SlimPajama and Adobe's internally generated "DocAssist" dataset.

113.    Adobe represented that SlimLM was an optimized language model designed to perform document-assistance functions directly on mobile devices, thereby reducing server costs and enhancing user privacy through on-device processing. Adobe further promoted SlimLM's ability to achieve performance comparable to substantially larger commercial language models despite requiring significantly fewer computational resources.

114.    Adobe additionally disclosed that SlimLM was built on the Mosaic Pre-trained Transformer ("MPT") architecture and further fine-tuned using tens of thousands of documents collected through Adobe's proprietary document-acquisition tools. Through these disclosures, Adobe emphasized the scalability, efficiency, and commercial viability of deploying SlimLM across a broad range of consumer-facing products and services.

115.    Notwithstanding these disclosures, Adobe failed to disclose that the datasets used to train SlimLM incorporated copyrighted books, articles, and web content obtained without authorization from the corresponding rights holders. Adobe likewise failed to disclose whether it had secured any licenses, permissions, releases, or compensation arrangements from the authors, publishers, and other copyright owners whose works were included in the training data.

116.    The Individual Defendants authorized, approved, and/or permitted Adobe's reliance on SlimPajama and related datasets because doing so enabled Adobe to accelerate the development and commercialization of competitive AI products without incurring the substantial costs, delays, and

operational burdens associated with assembling or licensing lawfully sourced training datasets.

117.    Rather than obtaining the necessary legal rights to the data it used to train its software products, the Individual Defendants approved an unlawful business plan predicated on violated others' copyrighted material out of a desire to achieve a competitive advantage in the "Ai race."  In so doing, the Defendants caused Adobe to blatantly violate intellectual property rights that it claimed to honor as a software company. Defendants knew, or were deliberately reckless in not knowing, that the datasets upon which SlimLM relied contained copyrighted material obtained without authorization. As a foreseeable consequence of that misconduct, Adobe has been exposed to substantial legal and regulatory risks, including class action copyright infringement claims brought by rights holders whose works were allegedly unlawfully infringed.

## VIII.    CLASS ACTION COPYRIGHT INFRINGEMENT LAWSUITS ARE FILED AGAINST ADOBE

118.    On December 16, 2025, plaintiffs filed a class action lawsuit against Adobe for copyright infringement (*Lyon*).  Thereafter, a second class action case was filed on February 9, 2026 (*Kleiner*). The actions allege that Adobe violated federal copyright and IP law by utilizing pirated libraries that included copyrighted materials and that Adobe's downloading, storage, and use of the copyrighted works was not fair use. The *Kleiner* complaint alleged that "[i]t is nearly impossible that 'any accused infringer could ever meet its burden of explaining why downloading source copies from pirate sites *that could have purchased or otherwise accessed lawfully* was itself reasonably necessary to any subsequent fair use." *Id*. (citing to *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1025 (N.D. Cal. 2025)).

119.    The *Lyon* class action alleged that the authors owned registered copyrighted material that was included in the SlimPajama dataset that was used by Adobe to train its SlimLM models, and that the authors never authorized Adobe to download, copy, store and/or use their copyright works as pre-training models.

120.    Reuters ran an article on December 17, 2025 entitled "Adobe Sued for Allegedly Misusing Authors' Work in AI Training."  The article noted that "The lawsuit is the latest in a wave of high-stakes U.S. lawsuits brought by copyright owners against tech companies over their AI training and the first such case against Adobe."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

121.    The same day, TechCrunch published an article which stated:[24]

Like pretty much every other tech company in existence, Adobe has leaned heavily into AI over the past several years. The software firm has launched a number of different AI services since 2023, including Firefly—its AI-powered media-generation suite. Now, however, the company's full-throated embrace of the technology may have led to trouble, as a new lawsuit claims it used pirated books to train one of its AI models.

Lyon's lawsuit, which was originally reported on by Reuters, says that her writing was included in a processed subset of a manipulated dataset that was the basis of Adobe's program: "The SlimPajama dataset was created by copying and manipulating the RedPajama dataset (including copying Books3)," the lawsuit says. "Thus, because it is a derivative copy of the RedPajama dataset, SlimPajama contains the Books3 dataset, including the copyrighted works of Plaintiffs and the Class members."

"Books3"—a huge collection of 191,000 books that have been used to train GenAI systems—has been an ongoing source of legal trouble for the tech community. RedPajama has also been cited in a number of litigation cases. In September, a lawsuit against Apple claimed the company had used copyrighted material to train its Apple Intelligence model. The litigation mentioned the dataset and accused the tech company of copying protected works "without consent and without credit or compensation." In October, a similar lawsuit against Salesforce also claimed the company had used RedPajama for training purposes.

122.    A December 18, 2025 article entitled "Explosive: Adobe Faces Massive Class-Action Lawsuit *Over Alleged AI Training Data Theft,"*[25] commented on Adobe's potential liability:

This case stands out for several reasons. First, Adobe has positioned itself as a company that respects creator rights, making these allegations particularly damaging to its reputation. Second, the lawsuit specifically targets the company's use of the Books3 dataset, which …. contains 191,000 books, potentially affecting thousands of authors.

*****

The Adobe case highlights a fundamental tension in the AI industry. Companies need massive amounts of data to train effective models, but obtaining proper licensing for all that content is expensive and complex. This has led some companies to use datasets like Books3 and RedPajama, which contains copyrighted material obtained through questionable means.

123.    After the *Lyon* action was filed, Defendants initially denied the allegations, "asserting that SlimLM was trained on SlimPajama-627B—an open-source datatset that was released by Cerebras

---

[24] *See* "Adobe Hit With Proposed Class-action, Accused of Misusing Authors' Work in AI Training," Dec. 17, 2025, TechCrunch.

[25] *See* "Explosive: Adobe Faces Massive Class-Action Lawsuit Over Alleged AI Training Data Theft*," Cryptorank, Dec. 18, 2025.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

in 2023. However, the lawsuit claims that SlimPajama is derivative of RedPajama, which includes Books3's set of nearly 200,000 pirated books. In short, the *Lyon* complaint argues that because SlimPajama includes RedPajama/Books3, it contains copyrighted work without consent, credit, or compensation."[26] On March 16, 2026, Adobe answered the *Lyon* complaint instead of moving to dismiss it.[27]

124.    The *Kleiner* action alleges that Adobe engaged in widespread and unauthorized misuse of copyrighted works through the use of the SlimPajama dataset and the copyrighted works via RedPajama and Common Crawl. The *Kleiner* action further alleges that:

Adobe used the SlimPajama dataset (comprised of data from the RedPajama and Common Crawl datasets), which includes materials sourced from shadow libraries known to indiscriminately hoover up countless copyrighted works, for its centralized commercial database, all with complete disregard to the rights of copyright holders. ***Adobe used these datasets containing Plaintiffs and Class members' copyrighted works as a substitute for purchasing or compensating creators for authorized copies of those works***. In doing so, Adobe displaced or diluted the market for Plaintiffs' and Class members' works. Plaintiffs works were copied and maintained for future commercial purposes, including to further develop its SlimLM series of SLMs. Pirating otherwise purchasable works is copyright infringement.

The exploitation of Plaintiffs Infringed Work was not indirect. It was and is a direct and illegal download, use and scraping of the entirety of Plaintiffs' Infringed Work (as part of the SlimPajama dataset) with no transformation of form. Plaintiffs Infringed Work was copied, used and maintained for future commercial purposes. Defendant's use was not transitory as Plaintiffs Infringed Work was not immediately destroyed, but was retained to train Adobe's SLMs. Integration of this technology into Adobe's existing document editing and creation suite could generate billions of dollars for Adobe. Adobe's "piracy of otherwise available copies is inherently, irredeemably infringing even if the pirated copies are immediately used for [a] transformative use and immediately discarded." *Id.* at 1025.

Adobe's use of these copyrighted works to train its SlimLM SLMs are not transformative. SLM outputs are the result of statistical outputs based on the training corpora. Broadly, SLMs operate by probabilistically predicting the next "token." Tokens are units of language which can be words, combinations of letters, or even a punctuation or space. Adobe's SlimLM models are no different. Recent studies demonstrate that the LLMs created by the leading AI developers are capable of regurgitating substantial portions of the training data for those models, even with the implementation of

---

[26] *See* "Adobe faces class action lawsuit after allegedly misusing authors work in AI training," TECHRADER, Dec. 19, 2025.

[27] No. 3:25-cv-10732-JSC (N.D. Cal. Mar. 16, 2026) (Dkt. No. 30).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

safeguards designed to prevent the regurgitation of training data. (Emphasis added.)[28]

**IX.   THE INDIVIDUAL DEFENDANTS CAUSED ADOBE TO REPURCHASE ITS OWN STOCK DURING THE RELEVANT PERIOD AT INFLATED PRICES, THUS DAMAGING ADOBE, AND VIOLATING SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934**

**A.  The Stock Repurchases Made by Adobe During the Relevant Period**

125.    During the Relevant Time Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.

126.    Adobe has a fiscal year that does not correspond to the calendar year.  Its 2025 fiscal year spanned the period from November 27, 2024 to November 28, 2025.

127.    According to Adobe's 2025 Annual Report on Form 10-K, filed January 15, 2026: "In March 2024, our Board of Directors granted authority to repurchase up to $25 billion of our common stock through March 14, 2028."  All Adobe's stock repurchases were directly approved by the Board.

128.    Adobe's 2024 Annual Report disclosed that "During fiscal 2024, we entered into accelerated share repurchase agreements ("ASRs") with large financial institutions whereupon we provided them with prepayments totaling $9.5 billion. Subsequent to November 29, 2024, as part of the March 2024 stock repurchase authority, we entered into stock repurchase arrangements with a large financial institution which totaled $3.25 billion, including a $2.75 billion ASR and a trading plan under which we may execute up to $500 million in open market repurchases."

129.    The 2024 Annual Report also disclosed the following facts regarding stock repurchases in fiscal year 2024:

| Number of Shares Delivered (in millions) | Average Price Paid Per Share |
|---|---|
| **Fiscal 2024** | |
| Structured stock repurchase agreement entered into in fiscal 2023 — 0.6 | $626.68 |
| ASR entered into in December 2023 — 3.5 | $578.11 |

[28] Dkt. No. 1 at 10-11.

| | | |
|---|---|---|
| ASR entered into in March 2024 | 5.2 | $475.94 |
| ASR entered into in June 2024 | 4.6 | $546.30 |
| ASR entered into in September 2024 | 3.6 | $—[29] |
| Total shares delivered | 17.5 | |

130. The 2024 Annual Report also disclosed that "Subsequent to November 29, 2024, as part of the March 2024 stock repurchase authority, we entered into stock repurchase arrangements with a large financial institution which totaled $3.25 billion, including a $2.75 billion ASR and a trading plan under which we may execute up to $500 million in open market repurchases. Under the ASR, we received an initial delivery of 4.5 million shares, which represents approximately 75% of our $2.75 billion prepayment."

131. Adobe's Form 10-Q filed on September 25, 2024 disclosed that: "During the nine months ended August 30, 2024, we repurchased a total of 12.9 million shares, including approximately 0.6 million shares at an average price of $626.68 through a structured repurchase agreement entered into during fiscal 2023, 3.5 million shares at an average price of $578.11 through an ASR entered into in December 2023, 5.2 million shares at an average price of $475.94 through an ASR entered into in March 2024, and 3.6 million shares from the initial delivery of an ASR entered into in June 2024. Subsequent to August 30, 2024, the ASR entered into in June 2024 was settled which resulted in total repurchases of 4.6 million shares at an average price of $546.30."

132. The 2025 Annual Report also stated that "During fiscal 2025, we entered into stock repurchase arrangements with large financial institutions and made payments totaling $11.28 billion to repurchase shares."[30]

133. The following chart reflects the repurchases of Adobe stock approved by the Board of Directors that were effectuated during the three months ending November 28, 2025:

---

[29] During fiscal 2024, Adobe received the initial delivery of shares under the ASR entered into in September 2024, which remained outstanding as of November 29, 2024. Subsequent to November 29, 2024, the outstanding ASR was settled which resulted in total repurchases of 5.0 million shares at an average price of $501.37.

[30] 2025 Form 10-K at p. 43.

| Period | Total Number of Shares Repurchased | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans | Approximate Dollar Value that May Yet be Purchased Under the Plans |
|---|---|---|---|---|
| | (in millions, except average price per share) | | | |
| August 30—September 26, 2025 | 2.1 | $ 353.68 | 2.1 | $    8,088 |
| September 27—October 24, 2025 | 2.3 | $ 345.96 | 2.3 | $    7,307 |
| October 25—November 28, 2025 | 2.8 | $ 332.31 | 2.8 | $    6,369 |
| Total | 7.2 | | 7.2 | |

134.    The 2025 Annual Report also stated:

In September 2025, we entered into a stock repurchase arrangement with a large financial institution to execute up to $2.5 billion in open market repurchases, which remained partially outstanding as of November 28, 2025. Upon completion of this arrangement, $*5.90 billion remains under our March 2024 stock repurchase authority*.

135.    Although Adobe did not provide the details of all the stock repurchases, the information it did disclose demonstrates that from March 2024 to November 28, 2025, Adobe repurchased $24.41 billion of its own stock, since only $5.91 billion of the $25 billion authorized repurchases remained available as of the end of 2025.

136.    Further, with respect to just those shares repurchased during fiscal year 2025, the repurchases represented a substantial increase from the amount of shares repurchased in Adobe's prior two fiscal years.  The 2025 repurchases of 30.8 million shares for $11.281 billion represented a 256% increase in dollar terms and a 268% increase in terms of number of shares repurchased compared to fiscal year 2023 (Adobe repurchased 11.5 million shares for $$4.4 billion in 2023), as reflected in the following chart:

| (in millions) | Number of Shares Delivered | Amount Paid |
|---|---|---|
| **Fiscal 2025** | | |
| Accelerated share repurchase agreements | 16.8 | $6,250 |
| Open market repurchases | 14.0 | $5,031 |
| Total | 30.8 | $11,281 |
| **Fiscal 2024** | | |
| Accelerated share repurchase agreements | 16.9 | $9,500 |
| Other structured stock repurchases | 0.6 | —— [31] |
| Total | 17.5 | $9,500 |
| **Fiscal 2023** | | |
| Accelerated share repurchase agreements | 4.0 | $1,400 |
| Other structured stock repurchases | 7.5 | $3,000 |
| Total | 11.5 | $4,400 |

137.    Adobe discloses that "Under the terms of our accelerated share repurchase agreements, financial institutions agree to deliver a portion of shares to us at contract inception and the remaining shares at settlement. The total number of shares delivered and average purchase price paid per share are determined upon settlement based on the Volume Weighted Average Price ("VWAP") over the term of the contract, less an agreed upon discount.  Under the terms of our other structured stock repurchase agreements, financial institutions agree to deliver shares to us at monthly intervals during the respective contract terms, and the number of shares delivered each month are determined based on the total notional amount of the contracts, the number of trading days in the intervals and the VWAP during the intervals,

---

[31] During fiscal 2024, Adobe received the final delivery of shares under a structured stock repurchase agreement entered into in fiscal 2023.

less an agreed upon discount."[32]

138.    Adobe also repurchased 8.1 million of its shares during the three months ending February 27, 2026, all of which were accomplished through open market purchases:

| Period | Total number of shares purchased | Average price paid per share (1) |
|---|---|---|
| 11/28/25 to 2/27/26 | 8,100,000 | $306[33] |

139.    As the Company's stock was artificially inflated during this time due to false statements and omissions made or approved by the Individual Defendants, the Company overpaid for the shares. As the figures above demonstrate, during 2025 Adobe paid an average of $372 when repurchasing its shares, and in 2024 and 2023 paid an average of $542.86 and $382.61.  It thus paid vastly inflated prices for its stock, which traded at just $204.02 when the truth was disclosed.

**B.  Loss Causation/Economic Loss**

140.    During the Relevant Time Period, as detailed herein, the Individual Defendants deceived the market and artificially inflated the prices of Adobe common stock and operated as a fraud or deceit on purchasers or acquirers of Adobe common stock, including Adobe which was repurchasing its own stock at Defendants' direction. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Adobe common stock fell precipitously as the prior artificial inflation came out. As a result of its purchases or acquisitions of Adobe common stock during the Relevant Time Period, Adobe suffered economic loss, *i.e.*, damages, under the federal securities laws.

141.    The Individual Defendants' false and misleading statements and omissions, which as alleged above were made with scienter, had the intended effect and caused Adobe common stock to trade at artificially inflated levels throughout the time of Adobe's stock purchases.

142.    On March 12, 2026, four minutes after the stock market had closed, Adobe announced that Defendant Narayen would resign as Adobe's CEO.  Adobe also announced its quarterly earnings

---

[32] 2025 Form 10-K at 78.

[33] Total price paid for the repurchases was $2.478 billion.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

and provided earnings guidance, which was disappointing to the market. Adobe's official press release is timestamped March 12, 2026, 1:04 PM Pacific Time. 1:04 PM Pacific Time corresponds to 4:04 PM Eastern Time. The Nasdaq market closes at 4:00 PM Eastern Time.

143.    On March 12, 2026, Adobe stock had closed at $269.78. In after-hours trading that day, Adobe's stock declined approximately 7.7%,

144.    When the stock market opened the next day—March 13, 2026—Adobe's stock opened at a materially lower price of $249.00, representing a decline of 7.7%. Adobe's stock closed that day almost unchanged, at $249.32 on unusually heavy trading volume of 17,406,400 shares. Narayen's unplanned departure was specifically attributed to his failure to develop and implement a viable AI strategy for Adobe.

145.    Adobe's stock had also declined due to analysts' concerns about Adobe's potential liability from the copyright cases. Adobe's earnings results and guidance disappointed analysts and investors, who expressed concerns regarding AI competition and growth prospects. Several contemporaneous reports specifically attributed the after-hours decline to the CEO transition announcement and uncertainty surrounding Adobe's AI strategy, despite earnings that exceeded analyst expectations. For example, Reuters published a story on March 12, 2026 entitled "Adobe's Longtime CEO to Exit Role Amid AI Disruption, Shares Fall." The article noted that "Adobe's longtime CEO Shantanu Narayen will leave his role once a successor is appointed, the design software maker said on Thursday, sending its shares down over 7% in extended trading on renewed worries around its strategy as it grapples with AI disruption." The article also noted that "the announcement of him leaving the helm puts the company in a precarious position as it comes at a time when Adobe is doubling down on AI, striking partnerships and exploring acquisitions to extend its industry lead." An analyst quoted by Reuters noted that "investor skepticism about monetization timing and payoff may have factored into a drop in its share prices." Similarly, a March 13, 2026 Bloomberg article entitled "Adobe CEO to Step Down in Face of Investor Concerns Over AI" noted that "Adobe has worked to weave artificial intelligence tools through its creative and marketing software—and offers its own range of AI models meant to generate imagery that doesn't carry copyright risks—in an effort to keep its massive market share."

146. Other news reports similarly attributed the stock decline to increased material risks to Adobe's AI strategy. The market was concerned about Adobe's stock declining from AI competition, which posed the threat of the creation of similar software products at a lower cost. Adobe had consistently represented to the market that it was protected from these risks due to its legally compliant AI strategy, pursuant to which it had built AI capabilities into its products. When Defendant Narayen resigned as Adobe's CEO and Adobe provided guidance that was lower than the market expected, the market perceived increased risk that Adobe's AI strategy would not be able to protect the Company against broader AI risks and that its AI strategy and products had, contrary to the Company's representations, been developed by violating intellectual property and copyrights held by others.

147. A March 12, 2026 article in Investor's Business Daily entitled "Adobe Stock Falls Despite Better-Than-Expected Report As CEO Steps Down" noted that despite Adobe having added AI functions across its creative and marketing software products "overall top-line growth continues to decelerate this year, and AI sales may not scale quickly enough to prevent further deceleration in FY27," quoting BNP Paribas analyst Stefan Slowinski. TD Cowen analyst Derrick Wood lowered his price target on Adobe stock to 325 from 400 and reiterated his hold rating.

148. Then, on June 11, 2026, after the market closed, Adobe shocked the market even further by announcing that Defendant Durn, its CFO and another key architect of its AI strategy, would also resign. The news triggered the steepest drop in Adobe's share price in 15 months, with the stock falling about 5% in after-hours trading.[34] The next day—on Friday, June 12, 2026, on a day when the overall stock market notched large gains and Elon Musk's SpaceX completed its IPO and began trading, Adobe's stock tanked over 10% in intraday trading, reaching a low of $196.90 and eventually closing at $204.02, a 6.76% decline from Adobe's closing price of $218.80 the day before, on unusually heavy trading of over 25 million shares. Analysts also attributed Durn's departure to failures in Adobe's AI strategy and lowered their targets for Adobe stock, citing concern that Adobe's AI products may generate revenue more slowly than expected.

149. According to Adobe's filing with securities regulators, Durn told Adobe of his

---

[34] *See* "Adobe's CFO Departs While Company Also Searches for a New CEO", BLOOMBERG, June 11, 2026.

resignation on June 8, 2026, indicating he would stop working *just one week* later (on June 15, 2026), an unusually short notice period for a CFO of a publicly-traded company.  Wall Street was shocked. Adobe had to scramble to do damage control.  Adobe failed to disclose this material fact to the market immediately, instead biding time to try to find an emergency replacement.  It was finally able to do so three days later, on June 11, 2026, disclosing that Durn would be temporarily replaced with Steve Day, the finance chief of one of Adobe's business units. Finance chiefs of $150 billion companies rarely leave in a week, and they rarely leave the day before earnings.  Adobe provided no explanation for Durn's departure in the dark of night, only disclosing that he was leaving to join another company, Marvell.

150.     The declines in the price of Adobe common stock after the disclosures came to light were a direct result of the nature and extent of the Individual Defendants' fraud finally being revealed to investors and the market and a materialization of the undisclosed risks alleged herein. The timing and magnitude of the price declines in Adobe common stock negates any inference that the loss suffered by Adobe was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Individual Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Adobe was a direct result of the Individual Defendants' fraudulent scheme to artificially inflate the price of Adobe common stock and the subsequent significant declines in the value of Adobe common stock when the Individual Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### C.  Scienter Allegations

151.     The Individual Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public statements they issued or disseminated during the relevant time period were false or misleading.  Alternatively, the Individual Defendants consciously or recklessly ignored red flags which demonstrated the falsity of Defendants' statements.

152.     The facts, when viewed holistically and together with the other allegations in the Complaint, establish a strong inference of scienter that each of the 10(b) Defendants knew or was severely reckless in not knowing that each of the alleged misrepresentations and omissions was false and misleading at the time that it was made.

153.     The Individual Defendants' scienter is demonstrated by the fact that they were actively

involved in the development of Adobe's AI strategy, which was a key board issue that had been prioritized as a "generational" opportunity.

154.    The Individual Defendants were also aware of news articles at the time alleging copyright infringement by Adobe.  An April 12, 2024 Bloomberg article alleged that Adobe's software products were trained on content for which Adobe did not have legal rights for the content.  *See* Rachel Mertz, "Adobe's 'Ethical' Firefly Was Trained on Midjourney Images," Bloomberg.   The reporter's investigation unearthed that contrary to Adobe's initial disclosures, Firefly was trained, in part, on AI-generated images. Some of these images were sourced from MidJourney, another AI tool known to contain infringing material.  As evidenced in company-managed Discord groups, internal discussions within Adobe showed that including these images was a known and intentional part of the training strategy. "Adobe was totally aware of what it was doing," Metz added, noting that the Company even awarded bonuses in September 2023 to contributors whose images were used to refine Firefly— including those who supplied AI-generated content via Adobe Stock.

155.    As another article on April 12, 2024 noted:

 The potential IP ramifications are significant. ***With AI-generated images forming part of Firefly's training dataset, questions about the originality and ownership of Firefly's output are brought to the fore***. This could affect how the tool is perceived among professionals who rely heavily on copyright protection to safeguard their creative investments.

***In response to inquiries, Adobe acknowledged using synthetic images, justifying it to enhance the model's effectiveness***. However, the company assured that all contributors, including those whose AI-generated photos were used, had been compensated.

The broader implications for the AI industry are profound. As AI tools increasingly infiltrate creative spaces, the lines between human-generated and machine-generated content blur, making it imperative for companies like Adobe to navigate these issues with greater transparency and adherence to their ethical standards.[35]

156.    The Individual Defendants were aware of these allegations of infringement at the time. They were also aware that Adobe had acknowledged at the time that some infringement had occurred, albeit downplaying the extent of the infringement.  In response to the April 12, 2024 articles, Adobe claimed that only approximately 5% of its AI training data at the time contained infringing images, and

---

[35] *See* "Adobe's Firefly Trained on AI-Generated Images Despite Ethical Claims," WEBPRONEWS, Apr. 12, 2024.

that those images had been created by some of its content creators using Midjourney images.  As noted in an April 22, 2024 article, "Adobe said the images from Midjourney only made up 5% of the training material. That's not a great defense. The company has 248 million images under license, so that 'only' could be up to 1.25 million pictures."[36]  "It doesn't matter if it's 5%, 1%, 000.1%," said Katie Robbert, CEO and co-founder of Trust Insights. "You are making the declarative statements of what your product does and doesn't do. And when it's shown that what you're saying is not true, then you're no longer a trustworthy brand."[37]

157.    The Individual Defendants were aware of these public concessions of infringement, and thus had a duty to investigate further, especially in light of the enormous financial risks to Adobe of infringement lawsuits.

158.    The Individual Defendants' scienter is also demonstrated by the fact that Adobe's Board members and executives had personally approved a major indemnification provision associated with the AI strategy.  Starting in 2023, prior to the start of the relevant time period, Adobe announced that enterprise customers of Firefly would receive "full indemnification for the content created" using Firefly. In other words, Adobe told its customers that if someone ever sued them claiming a Firefly-generated image infringed their copyright, Adobe would cover the legal bills and damages. "Anything created using Firefly's text-to-image tool will be fully indemnified by the company as a proof point that we stand behind the commercial safety of these features," said Adobe's VP of digital media at the time. The massive potential legal fees and damages associated with the blanket indemnification provision meant that the Board was actively monitoring the issue of whether images generated by Firefly violated any copyrights or intellectual property.

159.    The Individual Defendants' scienter is also demonstrated by the fact that they intentionally changed the language in Adobe's 2026 Proxy Statement pertaining specifically to whether the Company infringed copyright laws, removing language that had been in Adobe's two prior proxy statements (for 2024 and 2025) to the effect that no such infringement had occurred.  The following

---

[36] Constantine von Hoffman, "Legal Risks Loom for Firefly Users After Adobe's AI Image Tool Training Exposed," MARTECH, April 22, 2024.
[37] *Id.*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

chart demonstrates the omission:

| 2024 Proxy | 2025 Proxy | 2026 Proxy |
|---|---|---|
| *We trained our Adobe Firefly creative generative AI family of models only on licensed images from Adobe Stock, openly licensed content, and public domain content where the copyright has expired.* | *We chose to train the Adobe Firefly family of creative generative AI models on licensed and public domain content to offer customers a commercially safe solution that respects creator rights and doesn't infringe on third-party intellectual property rights.* | No such language. |

160.    The Individual Defendants' scienter is also demonstrated by their conduct in causing Adobe to repurchase billions of dollars of its own stock at inflated prices.  During the time that Adobe was developing SlimLM based on the Red Pajama dataset, the Board agreed to cause Adobe to repurchase its own common stock at prices that were artificially inflated by the materially false and misleading statements and omissions in Adobe's SEC filings. In March 2024, the Board—while aware of the true extent of the Company's copyright infringement on its AI platforms and datasets, and the false and misleading 2024 Proxy Statement and 2024 Annual Report—authorized a share repurchase program up to $25 billion through March 14, 2028. From March 2024 to February 27, 2026, Adobe repurchased $26.89 billion of its own stock at significantly inflated prices through a combination of accelerated repurchase agreements and open-market purchases. All these repurchases were made at times when the Defendants knew, but had failed to disclose, the Company's copyright infringement on its AI platforms and datasets. As a result, the Company paid artificially inflated prices to buy its own shares.

161.    Moreover, Adobe's share repurchases during the relevant time period were unusual in timing and amount.  Adobe ***more than doubled*** its annual repurchase spending from 2023 to 2024 and continued at an even higher level in 2025:

- Fiscal 2023 net repurchases: approximately $**4.1 billion**.

- Fiscal 2024 net repurchases: approximately $**9.1 billion**.

- Fiscal 2025 net repurchases: approximately $**10.9 billion**.

162.   Adobe's large and accelerated buyback program during the relevant time period helped Defendants earn higher salaries and bonuses, and increased the value of their Adobe stock holdings. Stock repurchases reduce share count and increase earnings per share.  Moreover, as the following chart demonstrates, the stock repurchases were carefully and unusually timed to coincide with the false statements the Defendants caused Adobe to make concerning its AI strategy, thus bolstering a finding of scienter:

| Fiscal Period | Share Repurchases | Key AI / Firefly Events |
|---|---|---|
| 2020 | ~$3.1B | Pre-generative AI era |
| 2021 | ~$4.0B | Early AI investment messaging |
| 2022 | ~$4.2B | Firefly development period; generative AI boom begins after ChatGPT launch |
| 2023 | $4.437B | Adobe launches and promotes Firefly as commercially safe AI |
| 2024 | $9.145B | Buybacks more than double; March 2024 $25B authorization; April 2024 Bloomberg article regarding Firefly training data |
| 2025 | $11.281B | Record repurchases; continued AI-focused investor messaging |
| Q1 2026 | $2.478B | Continued repurchases under remaining authorization |

## X.   DAMAGES TO ADOBE

163.   Adobe is significantly damaged by Defendants' misconduct. Due to the Defendants' failure to take required steps to eliminate copyrighted material from the AI SlimLM dataset, Adobe will be subject to potentially massive liability from the copyright infringement class actions. This includes not only the potential costs to resolve the litigation, but also legal fees, loss of goodwill, reputational damage, and lost customers, among other things.

164.   Adobe was further damaged by Defendant Narayen's unjust enrichment.  Narayen earned excessive compensation during the relevant time period, as the Defendants' false statements and stock repurchases caused Adobe's stock to be inflated.   Narayen was awarded compensation in the aggregate amount of $148,496,695 between 2023-25:

///

///

///

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards(1) ($) | Non-Equity Incentive Plan Comp.(2) ($) | All Other Comp.(3) ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Shantanu Narayen | 2025 | 1,500,000 | — | 45,376,110 | 3,120,000 | 1,177,825 | 51,173,935 |
| CHAIRMAN AND CEO | 2024 | 1,500,000 | — | 46,349,135 | 2,940,000 | 1,601,047 | 52,390,182 |
| | 2023 | 1,500,000 | — | 40,077,295 | 3,000,000 | 355,283 | 44,932,578 |

165.    Narayen's fiscal year 2025 annual total compensation of $51,173,935 vastly exceeded the annual total compensation of Adobe's median compensated employee, which was $235,989, resulting in a pay ratio of 217 to 1.  Such an outsized pay ratio was hardly just or equitable in light of Narayen's unlawful conduct which severely damaged Adobe and its shareholders.

166.    The Director Defendants received the following compensation for each of the years 2024 and 2025:

| Name | Cash Award ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| Cristiano Amon | 75,000 | 314,919 | 389,919 |
| Amy Banse | 105,000 | 314,919 | 419,919 |
| Brett Biggs | 31,649 | — | 31,649 |
| Melanie Boulden | 75,000 | 314,919 | 389,919 |
| Frank Calderoni | 145,000 | 314,919 | 459,919 |
| Laura Desmond | 78,036 | 314,919 | 392,955 |
| Spencer Neumann | 80,000 | 314,919 | 394,919 |
| Kathleen Oberg | 115,000 | 314,919 | 429,919 |
| Dheeraj Pandey | 80,000 | 314,919 | 394,919 |

| | | | |
|---|---|---|---|
| David Ricks | 75,000 | 314,919 | 389,919 |
| Daniel Rosensweig | 70,000 | 314,919 | 384,919 |

167.    The Directors' compensation in 2023 was as follows:

| Name | Cash Fees ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| Cristiano Amon | 7,830 | 150,609 | 158,439 |
| Amy Banse | 100,000 | 317,897 | 417,897 |
| Brett Biggs | 80,000 | 317,897 | 397,897 |
| Melanie Boulden | 75,000 | 317,897 | 392,897 |
| Frank Calderoni | 140,000 | 317,897 | 457,897 |
| Laura Desmond | 75,000 | 317,897 | 392,897 |
| Spencer Neumann | 80,000 | 317,897 | 397,897 |
| Kathleen Oberg | 110,000 | 317,897 | 427,897 |
| Dheeraj Pandey | 80,000 | 317,897 | 397,897 |
| David Ricks | 75,000 | 317,897 | 392,897 |
| Daniel Rosensweig | 70,000 | 317,897 | 387,897 |
| John Warnock | 42,858 | 317,897 | 360,755 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

168.    During this same time, meanwhile, Adobe significantly underperformed its peer group companies, as reflected in the following chart contained in Adobe's 2025 Proxy Statement:



169.    The Individual Defendants earned excessive compensation, stock awards, bonuses, and other compensation during the relevant time period.  The full details of the compensation have not been made public by Adobe, and thus discovery is necessary to allege all relevant facts regarding the unjust compensation earned by the Individual Defendants.  Adobe only discloses certain information about the compensation of its Section 16 officers.  However, based on that information, it is clear that Defendant Narayen earned unjust compensation because his compensation was based to a large extent on (1) earnings per share metrics that were artificially inflated due to the unlawful stock buyback program; and (2) Narayen's alleged success in Adobe's AI strategy, notwithstanding the fact that Narayen caused the Company to engage in material and substantial copyright infringement to achieve the supposed success in the AI strategy.

170.    Specifically, the 2026 Proxy reveals that Defendant Narayen's 2025 compensation was unjust due to at least the following facts:

(a)    **CASH BONUS**:  Mr. Narayen earned a cash incentive of $3,120,000, representing 104% of his target. This payout was affected by Adobe's corporate financial results: Adobe achieved $23.77 billion in revenue and diluted EPS of $16.70 on a GAAP basis and $20.94 on a non-GAAP basis, exceeding the targets which had been set and therefore entitling Narayen to a 100%

payout.  The EPS target, however, was manipulated by Narayen and the Individual Defendants by the massive stock buyback program, which materially reduced Adobe's outstanding shares and thus inflated Adobe's reported EPS figures.

(b)        **LONG-TERM EQUITY INCENTIVES AND AI STRATEGY**: Equity awards comprised *over 90% of the CEO's target compensation*. The factors affecting these awards included:

Increased Target Value for AI Leadership: The Compensation Committee increased Mr. Narayen's total target equity value in 2025 to motivate him to lead Adobe through a "significant transformational period" focused on artificial intelligence innovation, specifically citing his delivery of products like Adobe Firefly and Adobe GenStudio. These products, however, as detailed herein, were developed by infringing the IP and copyrights owned by others.  Narayen thus caused Adobe to violate federal law, leading to class action infringement lawsuits.  When those lawsuits came to light and the Company's Ai strategy was proven to be nowhere near as effective as Adobe had led Wall Street to believe, Narayen was allowed to "resign," causing the stock to tank 7.7%. This hardly represents the resounding success for which Narayen was paid out tens of millions of dollars less than two weeks before he resigned.

Relative Total Stockholder Return (TSR): A significant portion of Narayen's performance shares (PSPs) are tied to Adobe's TSR relative to the Nasdaq 100. For the 2023 PSP (which vested in January 2026), the overall payout was 83% of target because Adobe's relative TSR rank was at the 28th percentile, failing to reach the 55th percentile required for a full payout.  As the chart above demonstrates, however, Adobe's TSR was dismal compared to its competitors.  Adobe achieved a return of just $67.11, compared to the peer group return of $187.96.  In other words, an investor who bought Adobe stock in 2020 lost a significant amount of money, having just $67.11 left from an original investment of $100.  An investor who bought stock in the peer group companies in 2020, in stark contrast, earned a significant return, having earned $187.96 from the original $100 investment. Narayen's compensation was thus unjust in that he was paid a

significant bonus despite destroying shareholder value. Narayen in fact was paid out at 85% of the target of this metric despite achieving horrible results.

171. Adobe was also damaged by paying Narayen the following unwarranted and unjust perquisites in 2025 alone: (a) Narayen was paid $880,354 for "**Security Services**" for professional security services; and (b) **Corporate Aircraft**: He was provided a $400,000 allowance for his *personal* use of the Company's private jet.

172. The Director Defendants' compensation was also unjust for the following reasons. As disclosed in the Company's proxy statements, Adobe targets its director compensation against a specific peer group of 20 technology companies (including Alphabet, Microsoft, and Meta). The Compensation Committee targets the equity compensation for the directors to be within the 50th to 75th percentile range of the peer group. The total shareholder return for Adobe, however, was well below that of the peer group identified in the proxy. In addition, the directors caused the Company to violate copyrights and IP, to issue false and misleading statements, and to repurchase billions of dollars of the Company's stock at inflated prices. This conduct caused Adobe's reported financial performance to be artificially inflated, thus directly inflating the financial metrics used by the Compensation Committee to set the Director Defendants' cash and stock compensation. Under these circumstances, the directors were unjustly enriched.

173. Adobe was also damaged by spending nearly **$26.89 billion** to repurchase its own stock at market prices artificially inflated by the false and misleading statements and omissions in SEC filings approved by the Director Defendants, amounting to a massive waste of corporate assets.

## XI.     INSIDER SELLING BY DEFENDANTS DURN AND NARAYEN

174. Defendant Daniel Durn is Adobe's Executive Vice President and Chief Financial Officer. During the Relevant Time Period, Adobe repeatedly quoted Durn in its public statements announcing repurchase authorizations, and he oversaw Adobe's finances, treasury, and capital allocation decisions, including issues surrounding the stock repurchases. Adobe's leadership profile states he is responsible for Finance, Technology, Security and Operations.

175. Defendant Shantanu Narayen was Adobe's Chairman of the Board and CEO. In such roles, Narayen was heavily involved in approving the Company's stock repurchases.

176.     During the Relevant Time Period, and while they were involved in making key decisions regarding Adobe's $25 billion stock buyback program announced in March 2024, Durn and Narayen engaged in unlawful insider trading.  As the chart below demonstrates, Durn and Narayen sold millions of dollars of Adobe stock at the same time that Adobe was repurchasing its stock, thus violating Section 20A of the Securities and Exchange Act of 1934.  Durn sold 39,936 shares for proceeds of $16,428,202 and Narayen sold 202,441 shares for proceeds of $73,407,371.

**DANIEL DURN INSIDER TRADING ACTIVITY**

| Date | Transaction | Shares | Price Per Share | Transaction Value |
|---|---|---|---|---|
| Apr. 15, 2024 | Sell | 932 | $470.10 | $438,133 |
| Apr. 24, 2024 | Sell | 317 | $477.12 | $151,247 |
| May 15, 2024 | Sell | 2,008 | $485.35 | $974,583 |
| Jul. 15, 2024 | Sell | 932 | $565.71 | $527,242 |
| Jul. 24, 2024 | Sell | 317 | $531.04 | $168,340 |
| Aug. 15, 2024 | Sell | 2,008 | $554.16 | $1,112,753 |
| Sep. 17, 2024 | Sell | 6,500 | $515.44 | $3,350,360 |
| Oct. 15, 2024 | Sell | 932 | $508.03 | $473,484 |
| Oct. 24, 2024 | Sell | 316 | $482.87 | $152,587 |
| Nov. 15, 2024 | Sell | 2,008 | $503.37 | $1,010,767 |
| Jan. 15, 2025 | Sell | 950 | $417.28 | $396,416 |
| Jan. 24, 2025 | Sell | 4,324 | $435.38 | $1,882,583 |
| Apr. 17, 2025 | Sell | 1,481 | $350.38 | $518,913 |
| Apr. 28, 2025 | Sell | 317 | $360.91 | $114,408 |
| Jul. 17, 2025 | Sell | 1,482 | $364.18 | $539,715 |
| Jul. 28, 2025 | Sell | 317 | $371.69 | $117,826 |
| Oct. 16, 2025 | Sell | 1,481 | $330.63 | $489,663 |
| Oct. 27, 2025 | Sell | 317 | $353.52 | $112,066 |
| Jan. 16, 2026 | Sell | 1,509 | $304.09 | $458,872 |
| Jan. 27, 2026 | Sell | 11,488 | $299.29 | $3,438,244 |
| **TOTAL** | | 39,936 | | **$16,428,202** |

**SHANTANU NARAYEN INSIDER TRADING ACTIVITY**

| Date | Transaction | Shares | Price Per Share | Transaction Value |
|---|---|---|---|---|
| Apr. 15, 2024 | Sell | 1,716 | $470.10 | $806,692 |
| Apr. 24, 2024 | Sell | 1,269 | $477.12 | $605,465 |
| June 27, 2024 | Sell | 25,000 | $544.11 | $13,602,750 |
| Jul. 15, 2024 | Sell | 1,717 | $565.71 | $971,324 |
| Jul. 24, 2024 | Sell | 1,270 | $531.04 | $674,421 |
| Sep. 25, 2024 | Sell | 25,000 | $521.58 | $13,039,500 |
| Oct. 15, 2024 | Sell | 1,716 | $508.03 | $871,779 |
| Oct. 24, 2024 | Sell | 1,269 | $482.87 | $612,762 |
| Jan. 15, 2025 | Sell | 1,729 | $417.28 | $721,477 |
| Jan. 24, 2025 | Sell | 19,605 | $435.38 | $8,535,625 |

| Apr. 17, 2025 | Sell | 2,696 | $350.38 | $944,624 |
|---|---|---|---|---|
| Apr. 28, 2025 | Sell | 621 | $360.91 | $224,125 |
| Jul. 17, 2025 | Sell | 2,697 | $364.18 | $982,193 |
| Jul. 28, 2025 | Sell | 621 | $371.69 | $230,819 |
| Oct. 16, 2025 | Sell | 2,696 | $330.63 | $891,378 |
| Oct. 27, 2025 | Sell | 621 | $353.52 | $219,536 |
| Jan. 16, 2026 | Sell | 2,715 | $304.09 | $825,604 |
| Jan. 27, 2026 | Sell | 34,483 | $301.07 | $10,381,797 |
| Apr. 30, 2026 | Sell | 75,000 | $243.54 | $18,265,500 |
| **TOTAL** | | **202,441** | | **$73,407,371** |

## XII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

177. Plaintiffs bring this action derivatively and for the benefit of Adobe to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Adobe, unjust enrichment, and violations of the Exchange Act.

178. Adobe is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

179. Plaintiffs are, and have been at all relevant times, shareholders of Adobe. Plaintiffs will adequately and fairly represent the interests of Adobe in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

180. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

181. A pre-suit demand on the Board of Adobe is futile and, therefore, excused. At the time this action was commenced, the Board consisted of the eleven Director Defendants: Narayen, Amon, Banse, Boulden, Calderoni, Desmond, Neumann, Oberg, Pandey, Ricks, and Rosensweig. Since Adobe has an odd-numbered board, Plaintiffs need to allege demand futility as to six of the eleven Directors that were on the Board at the time this action was filed.

182. Delaware law applies a director-by-director "three-part test as the universal test for assessing whether demand should be futile." *United Food & Com. Workers Union and Participating Food Indus. Emps. Tr-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1057-58 (Del. 2021). The three-part test asks with respect to each Demand Director: "(i) whether the director received a material

personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Id.*

### A.    Each Demand Director Faces a Substantial Likelihood of Personal Liability for Lack of Oversight

183.    The second inquiry in the demand futility test under Delaware law is whether a director faces a substantial likelihood of liability on any of the claims that are the subject of the litigation demand. Here, each Demand Director faces a substantial likelihood of liability for breaching his or her oversight duties in bad faith.

184.    For a software company like Adobe, intellectual property rights, including copyright protection, is a ***mission critical issue*** to the Company.  If third parties could violate Adobe's copyright protections willy-nilly, Adobe's software would have no value and the Company's revenues would collapse.  In a similar vein, if Adobe violates the copyright rights of other companies or persons, it exposes itself to substantial damages.  Even worse, if Adobe's own software is developed in such a way that violates intellectual property rights, the consequences are dire, as Adobe's software would be imbued with copyright violations, posing a much more substantial threat, as the legal violations would threaten the Company's recurring revenues from its software, thereby not only exposing it to damages but also adversely impacting its revenues, profits, and growth rate.  That is what happened here under the Director Defendants' watch.

185.    All eleven of the Demand Directors—Narayen, Amon, Banse, Boulden, Calderoni, Desmond, Neumann, Oberg, Pandey, Ricks, and Rosensweig—have been on the Board of Directors at all relevant times, including during the time that Adobe committed the copyright and IP violations, and all Demand Directors made the false and misleading statements and also caused Adobe to make the stock repurchases.  Thus, all eleven Demand Directors are interested because they face a substantial likelihood of liability for each of the claims asserted herein.

186.    The tenure of the current Demand Board is reflected in the chart below:

| Director | Joined Board | Approx. Tenure (as of June 2026) |
|---|---|---|
| Shantanu Narayen | Dec. 2007 | 18.5 years |
| Daniel Rosensweig | Jan. 2009 | 17.5 years |
| Amy Banse | May 2012 | 14 years |
| Frank Calderoni | May 2012 | 14 years |
| Laura Desmond | May 2012 | 14 years |
| David Ricks | Apr. 2018 | 8.2 years |
| Kathleen Oberg | Jan. 2019 | 7.4 years |
| Dheeraj Pandey | Jan. 2019 | 7.4 years |
| Melanie Boulden | Oct. 2020 | 5.7 years |
| Spencer Neumann | Jan. 2022 | 4.4 years |
| Cristiano Amon | Oct. 2023 | 2.6 years |

187.    The Demand Directors also failed to act on numerous red flags related to Adobe's copyright and IP infringement.  First, an April 12, 2024 Bloomberg article alleged that Adobe's software products were trained on content for which Adobe did not have legal rights for the content.  *See* Rachel Mertz, "Adobe's 'Ethical' Firefly Was Trained on Midjourney Images," Bloomberg.  The reporter's investigation unearthed that contrary to Adobe's initial disclosures, Firefly was trained, in part, on AI-generated images. Some of these images were sourced from MidJourney, another AI tool known to contain infringing material.  As evidenced in company-managed Discord groups, internal discussions within Adobe showed that including these images was a known and intentional part of the training strategy. "Adobe was totally aware of what it was doing," Metz added, noting that the company even awarded bonuses in September 2023 to contributors whose images were used to refine Firefly—including those who supplied AI-generated content via Adobe Stock.

188.    Second, a different article on April 12, 2024[38] noted that "The potential IP ramifications are significant. ***With AI-generated images forming part of Firefly's training dataset***, ***questions about the originality and ownership of Firefly's output are brought to the fore***. This could affect how the tool is perceived among professionals who rely heavily on copyright protection to safeguard their creative investments."  The article further noted that "***In response to inquiries***, ***Adobe acknowledged***

---

[38] *See* "Adobe's Firefly Trained on AI-Generated Images Despite Ethical Claims," WEBPRONEWS, Apr. 12, 2024.

*using synthetic images*, *justifying it to enhance the model's effectiveness*."

189.    Third, in mid-2024, Adobe faced intense criticism after updating its Terms of Use. Many creators interpreted the revised language as giving Adobe broad rights to access and potentially use customer content for AI purposes.

190.    Fourth, the Demand Directors personally approved a major indemnification provision associated with the AI strategy.  Starting in 2023, prior to the start of the relevant time period, Adobe announced that enterprise customers of Firefly would receive "full indemnification for the content created" using Firefly. In other words, Adobe told its customers that if someone ever sued them claiming a Firefly-generated image infringed their copyright, Adobe would cover the legal bills and damages. "Anything created using Firefly's text-to-image tool will be fully indemnified by the company as a proof point that we stand behind the commercial safety of these features," said Adobe's VP of digital media at the time.  The massive potential legal fees and damages associated with the blanket indemnification provision meant that the Board was actively monitoring the issue of whether images generated by Firefly violated any copyrights or intellectual property. The Board thus knew or consciously ignored the copyright infringement.

191.    Finally, all eleven Demand Directors approved each of the Company's 2024, 2025, and 2025 Proxy Statements.  The Director Defendants all approved a major change in the language of the 2026 Proxy Statement that removed the prior, unequivocal statements in the prior years' proxy statements to the effect that Adobe was not engaging in any copyright infringement.  This is strongly indicative of scienter.  The following chart demonstrates the omission:

| 2024 Proxy | 2025 Proxy | 2026 Proxy |
|---|---|---|
| *We trained our Adobe Firefly creative generative AI family of models only on licensed images from Adobe Stock, openly licensed content, and public domain content where the copyright has expired*. | *We chose to train the Adobe Firefly family of creative generative AI models on licensed and public domain content to offer customers a commercially safe solution that respects creator rights* | No such language. |

| | *and doesn't infringe on third-party intellectual property rights*. | |
| --- | --- | --- |

192.    The Demand Directors consciously ignored these red flags.  For these reasons, the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability for their wrong acts, such that demand on the Board to institute this action is excused as futile.

**B.    Each Demand Director Faces a Substantial Likelihood of Liability for Approving the Issuance of False and Misleading Public Statements**

193.    As explained above, the Individual Defendants caused Adobe to issue numerous false and misleading disclosures during the Relevant Period, misrepresenting that Adobe had not trained its AI with any copyrighted material and concealing the extent to which Adobe had infringed the IP and copyrights of other persons and companies.

194.    The Adobe directors were ultimately responsible for the Company's public disclosures. Each Demand Director approved one or more of the false and misleading statements alleged herein.

195.    The Director Defendants, together and individually, violated and breached their fiduciary duties of loyalty and acted in bad faith. The Director Defendants knowingly approved and/or permitted the wrongful conduct alleged herein and caused the Company to engage in copyright infringement misconduct, authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to stockholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute the causes of action asserted herein.

196.    Each Demand Director had actual knowledge of the undisclosed material facts alleged herein and knowingly or consciously disregarded them in bad faith when approving the false and misleading statements.  The Demand Directors either knowingly or recklessly issued or caused the Company to engage in copyright infringement misconduct, and to issue the materially false and misleading statements alleged herein. The Director Defendants knowingly approved and/or permitted a

business model to train Adobe's AI products on a dataset that included copyrighted materials and knew of the falsity of the misleading statements in SEC filings at the time they were made. The Director Defendants thus face a substantial likelihood of liability and are not disinterested.

## C.    Defendant Narayen is Interested and Received Improper Financial Benefits

197.    Defendant Narayen has served as the CEO of the Company at relevant times and is not disinterested or independent. Narayen derived his sole employment income from Adobe and does not qualify as an independent director, as Adobe's proxy statements admit.

198.    Further, as alleged herein, Narayen was awarded unjust compensation in the aggregate amount of $148,496,695 million between 2023-25.  His massive compensation was unjust because he breached his fiduciary duties, issued false and misleading statements, and manipulated the targets for his compensation.  He is therefore interested in the claims asserted herein and demand is clearly futile as to Narayen.

## D.    All Director Defendants are Interested Because They Received Improper Financial Benefits Directly Related to Their Wrongdoing

199.    Each of the Demand Directors is interested because they received improper financial benefits.  To be clear, as particularly alleged herein, Plaintiffs do not simply allege that the Demand Directors received director fees.  Instead, from 2023 to 2025 they received both cash fees and stock grants that were directly inflated due to the wrongdoing in which they directly participated.

200.    Specifically, the Compensation Committee targets the equity compensation for the directors to be within the 50th to 75th percentile range of the peer group.  The total shareholder return for Adobe, however, was well below that of the peer group identified in the proxy.  In addition, the directors caused the Company to violate copyrights and IP, to issue false and misleading statements, and to repurchase billions of dollars of the Company's stock at inflated prices.  This conduct caused Adobe's reported financial performance to be artificially inflated, thus directly inflating the financial metrics used by the Compensation Committee to set the Director Defendants' cash and stock compensation.

## E.    Demand is Futile as to the Audit Committee Directors

201.    The Audit Committee Defendants (Desmond, Neumann, Pandey, and Oberg) are not disinterested or independent, and therefore, are incapable of considering a demand.  The Audit

Committee Directors were responsible for assessing the adequacy and effectiveness of Adobe's technology security policies, internal controls regarding information and technology security, cybersecurity, and privacy related areas, compliance with related legal, regulatory and ethical requirements, and public disclosure requirements. The Audit Committee Defendants breached their fiduciary duties to the Company by allowing Adobe to engage in copyright violations and by failing to prevent and correct such violations after they occurred, thus exposing the Company to substantial damages.   The Audit Committee Defendants therefore cannot independently consider any demand to sue themselves for breaching their fiduciary duties and committing violations of the '34 Act.

### F.     Demand is Futile For Additional Reasons

202.    The Director Defendants' conduct was not the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As all of the directors face a substantial likelihood of liability, they are self-interested in the conduct challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company. Accordingly, demand is excused as being futile.

203.    The acts complained of herein constitute violations of fiduciary duties owed by Adobe's officers and directors, and these acts are incapable of ratification.

204.    The Director Defendants are covered by D&O insurance policies.  Such policies contain provisions that eliminate coverage for any action brought by Adobe against the Individual Defendants, known as the "insured versus insured exclusion."  As a result, if the Demand Directors were to sue themselves or certain of the officers of Adobe, there would be no D&O insurance protection.  By contrast, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under Adobe's D&O insurance policy. Thus, there is no majority of disinterested directors among the Director Defendants and demand is excused as futile.

///

## XIII.   CAUSES OF ACTION

### COUNT I
### BREACH OF FIDUCIARY DUTY
### (Against All Individual Defendants)

205.   Plaintiffs repeat and reallege each and every allegation contained above as though fully set forth in this paragraph.

206.   As Adobe's directors and/or officers, the Individual Defendants owed Adobe the fiduciary duties of loyalty and care.

207.   The fiduciary duties the Individual Defendants owed to Adobe included, without limitation, implementing and overseeing a system of internal controls to monitor, detect and prevent unlawful violations of copyright and IP laws.  The Individual Defendants' duty of loyalty required them to make good faith efforts to ensure that the Company's policies, procedures and practices did not systematically violate federal copyright and IP laws.

208.   The Individual Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

a.   despite knowing that Adobe was training its AI on material for which it lacked the relevant copyright rights, they consciously and repeatedly failed to ensure that the Company's reporting systems were adequately designed to detect copyright and IP infringement, thus disabling them from being informed of risks or problems requiring their attention;

b.   consciously disregarding their duty to investigate red flags and to remedy any misconduct uncovered; and

c.   consciously issuing false and misleading statements to stockholders, including in the Company's 2023 to 2025 Annual Reports, Quarterly Reports, and Proxy Statements.

209.   The conduct of the Individual Defendants, individually and collectively, as set forth herein, was due to their conscious intentional, knowing, and/or reckless disregard for the fiduciary duties

owed to the Company.

210.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls and failed to provide adequate oversight to protect the Company from liability related to the Company's unlawful copyright infringement.

211.    These actions were not good-faith exercises of prudent business judgment to protect and promote the Company's corporate interests and those of its stockholders.

212.    As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary duties, Adobe has sustained significant damages, both financially and to its corporate image and goodwill.  Such damages to Adobe include, and will include, substantial risk of liability, legal costs, increased regulatory scrutiny, reputational damages, declining customer base, declining revenue, declining stock price, increased cost of capital, and other costs, damages and liabilities.

213.    For their conscious and bad faith misconduct alleged herein, the Individual Defendants are liable to the Company.

214.    In addition, the Director Defendants have further breached their fiduciary duties by deciding not to exercise the Compensation Committee's and Board's authorities and responsibilities under the Clawback Policy to claw back, forfeit, and recover the executive compensation of Defendant Narayen and others—to the extent that compensation was earned as a result of misconduct and failures in risk management resulting in copyright infringement and the filing of materially false and misleading SEC filings —the Director Defendants have caused the Company to waste its valuable corporate assets by paying  Narayen and others highly wasteful executive compensation and allowing them to retain that compensation despite the misconduct and failures in risk management that led to the Company's copyright infringement and other misconduct.

215.    Plaintiffs, on behalf of Adobe, have no adequate remedy at law.

## COUNT II
### VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9
### (AGAINST THE DIRECTOR DEFENDANTS)

216.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph, except to the extent those allegations plead knowing

or reckless conduct by the Director Defendants. This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

217. SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

218. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2023, 2024, and 2025 Proxy Statements. Such Proxy Statements contained proposals to Adobe's stockholders urging them to re-elect the members of the Board and approve executive compensation. The Proxy Statements, however, misstated or failed to disclose (i) deficiencies in Adobe's internal and disclosure controls that were known to the Board when the Proxy Statements were filed; and (ii) reporting failures known to the Board when the Proxy Statements were filed, which failed to address on-going unlawful copyright infringement. By reason of the conduct alleged in this Complaint, the Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of the Director Defendants' wrongful conduct, Adobe misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Adobe's recommendation to re-elect the current Board, approve certain executive compensation, and vote against stockholder proposals presented to the Company.

219. The misleading information contained in the 2023 – 2026 Proxy Statements was material to Adobe's stockholders in determining whether or not to elect the Director Defendants and approve certain executive compensation. This information was also material to the integrity of the directors who were proposed for election to the Board. The proxy solicitation process in connection with the Proxy

Statements was an essential link in (i) the reelection of nominees to the Board, and (ii) the approval of the executive compensation plan.

220. Plaintiffs, on behalf of Adobe, seek relief for damages inflicted upon the Company based on the misleading 2023 – 2026 Proxy Statements in connection with the improper re-election of the members of the Board, approval of executive compensation, and defeat of shareholder proposals.

221. This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiffs discovered or reasonably could have discovered the facts on which this claim is based.

### COUNT III
### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND
### SEC RULE 10B-5 PROMULGATED THEREUNDER
### (AGAINST THE DIRECTOR DEFENDANTS)

222. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

223. During the Relevant Period, the Director Defendants disseminated or approved false or misleading statements and omissions about Adobe related to the Company's AI strategy, including representing that its software products were "commercially safe" because Adobe had only trained Firefly and its other software on Adobe Stock and public domain content, thereby avoiding the copyright infringement risks associated with software from other competing companies. Defendants made other false and misleading statements and omissions on similar topics, as alleged more particularly herein.

224. The Director Defendants knew or recklessly disregarded statements that were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

225. At the same time that the price of the Company's common stock was inflated due to the false or misleading statements, the Director Defendants caused the Company to repurchase billions of dollars of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements. From March 2024 to February 27, 2026, the Director Defendants caused Adobe to repurchase $**26.89 billion** of its own stock at significantly inflated prices.

226. The Director Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Adobe in connection with the Company's purchases of its stock during the Relevant Period.

227. The Director Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails; (a) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (b) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (c) made the above statements intentionally or with a severely reckless disregard for the truth; and (d) employed devices and artifices to defraud in connection with the purchase and sale of Adobe stock, which were intended to, and did, (a) deceive Adobe regarding, among other things, the Company's lack of internal controls to monitor, detect and prevent illegal copyright infringement; and (b) artificially inflate and maintain the market price of Adobe stock.

228. The Director Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

229. As described above, Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to Defendants or were so obvious that Defendants should have been aware of them. Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

230. As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Adobe stock during the Relevant Period. By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC

Rule 10b-5.

231. Plaintiffs brought this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

## COUNT IV
### VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
### (AGAINST THE DIRECTOR DEFENDANTS)

232. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

233. During their tenures as officers and/or directors of Adobe, each of the Director Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Adobe, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Adobe, including its materially misleading statements in the Company's SEC filings, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

234. As set forth above, Adobe violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Adobe and as a result of their own aforementioned conduct, the Director Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Adobe, each of these Defendants was culpable for the material misstatements and omissions made by Adobe, including the misstatements and omissions in the Company's SEC filings and other statements, as set forth above.

## COUNT V
### VIOLATION OF § 20A OF THE 1934 ACT
### (AGAINST DEFENDANTS DURN AND NARAYEN)

235. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

236. While Adobe securities traded at artificially inflated and distorted prices, Defendants

Durn and Narayen personally profited by selling shares of Adobe common stock on the dates alleged *supra*—while they were in possession of adverse, material non-public information about the Company. Durn sold 39,936 shares for proceeds of $16,428,202 and Narayen sold 202,441 shares for proceeds of $73,407,371.

237.    Contemporaneously, Adobe repurchased its own shares during this same period, repurchasing $26.89 billion of its own stock at significantly inflated prices.

238.    The exact dates of Defendants' sales of Adobe stock are alleged *supra*.  The exact dates of each repurchase of Adobe stock by the Company is not known, and discovery is necessary to learn all the exact dates because Adobe does not disclose the details of each stock repurchase, and instead only publishes summary data.  The data publicly disclosed by Adobe is alleged herein.  However, based on the huge volume of shares involved in Adobe's stock repurchase plan, and the fact that the repurchase program was ongoing during the entire Relevant Time Period, Plaintiffs believe, and on that basis allege, that Adobe repurchased its shares within one to three days of each date that the Defendants sold stock.

239.    Adobe suffered damages because:  (a) in reliance on the integrity of the market, Adobe paid artificially inflated prices as a result of Defendants' violations of §§ 10(b) and 20 (a) of the 1934 Act as alleged herein; and (b) Adobe would not have repurchased its shares at the same prices if had been aware that the market for Adobe stock had been artificially inflated by the false and misleading statements and omissions alleged herein.

240.    By reason of the foregoing, Defendants violated § 20A of the 1934 Act and are liable to Adobe for the substantial damages the Company sustained in connection with its purchases of Adobe common stock during the Relevant Period.

### XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment in the form of an order:

A.    Declaring that Plaintiffs may maintain this action on behalf of Adobe and that Plaintiffs are adequate representatives of the Company;

B.    Declaring that Defendants have breached their fiduciary duties to Adobe;

C.    Determining and awarding to Adobe the damages sustained as a result of the violations set forth above by all Defendants, jointly and severally, together with pre-judgment and post-judgment

interest thereon;

D.    Directing Adobe to take all necessary actions to reform and improve its corporate governance, internal controls, and policies by implementing a Board-level reporting and information system—and to monitor that system—to ensure that the Company addresses copyright infringement in any form, and any other civil and criminal laws relating to violation of intellectual property rights;

E.    Awarding against all Defendants and in favor of the Company extraordinary equitable and injunctive relief as permitted by law and/or equity as this Court deems just and appropriate;

F.    Awarding Plaintiffs' costs and disbursements for this action, including reasonable attorneys' fees and expenses; and

G.    Granting such other relief as this Court deems just and appropriate.

## XV.    JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: June 16, 2026                              Respectfully submitted,

BOTTINI & BOTTINI, INC.

*s/ Francis A. Bottini, Jr.*
Francis A. Bottini, Jr.

Francis A. Bottini, Jr. (SBN 175783)
Aaron P. Arnzen (SBN 218272)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002
Email:          fbottini@bottinilaw.com
                   aarnzen@bottinilaw.com

*Counsel for Plaintiffs Michael Hirschberger, James Peterson and Mitchell Small*

70
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Michael Hirschberger, verify that I am a shareholder of nominal defendant Adobe, Inc. (the "Company"), and that I have continuously owned stock in the Company at all relevant times. I have reviewed the allegations in this Verified Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 6/12/2026 | 4:21 PM PDT

_____

Michael Hirschberger

**VERIFICATION**

I, James Peterson, verify that I am a shareholder of nominal defendant Adobe, Inc. (the "Company"), and that I have continuously owned stock in the Company at all relevant times. I have reviewed the allegations in this Verified Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 6/13/2026 | 8:43 AM PDT

_James Peterson_
_____
James Peterson

## **VERIFICATION**

I, Mitchell Small, verify that I am a shareholder of nominal defendant Adobe, Inc. (the "Company"), and that I have continuously owned stock in the Company at all relevant times. I have reviewed the allegations in this Verified Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 6/12/2026 | 6:36 PM PDT

_Mitchell Small_
_____
Mitchell Small